**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Darren Wesley HUFF, Defendant–Appellant.**

**No. 12–5581.**

United States Court of Appeals, Sixth Circuit.

Nov. 4, 2015.

Before: BOGGS and MOORE, Circuit Judges; and BARRETT, District Judge.*

BOGGS, J., delivered the judgment of the court and issued an opinion that constitutes the opinion of the court except with respect to Sections II.A and II.B.1. BARRETT, J., delivered a separate concurring opinion, in which MOORE, J., joined.

BOGGS, Circuit Judge.

Defendant Darren Wesley Huff was convicted in federal district court of transporting a firearm in commerce with the intent that it be used unlawfully in furtherance of a civil disorder, in violation of 18 U.S.C. § 231(a)(2). He was sentenced to forty-eight months of imprisonment. Huff appeals his conviction and sentence. He argues that (1) the district court erred in denying his motion to suppress evidence; (2) Congress exceeded its authority under the Commerce Clause in enacting the statute under which he was convicted; (3) the statute under which he was convicted is vague and overbroad, in violation of the First and Second Amendments; (4) his indictment was constitutionally deficient; (5) the evidence at trial was insufficient to support his conviction; (6) the district court erred in sentencing him by analogizing to the sentencing guideline for aggravated assault; and (7) the district court erred in declining to impose a lesser sentence by varying downward even more than it did. We affirm.

To the extent that this opinion is inconsistent with the concurring opinion, the concurring opinion constitutes the opinion of the court.

## I

The following background facts are not in dispute. On three separate occasions beginning in the fall of 2009, Walter Fitzpatrick attempted to present fraud and treason charges against President Obama to a three-member grand-jury panel in the Monroe County courthouse in Madisonville, Tennessee. The panel declined Fitzpatrick's invitations to indict the President. On the third occasion, Fitzpatrick also attempted to bring charges against the personnel of the Monroe County criminal-court system, including the grand-jury foreman, Gary Pettway, presumably for failing to indict the President at Fitzpatrick's request.

On April 1, 2010, defendant Huff, a resident of Dallas, Georgia, accompanied Fitzpatrick on yet another visit to the Monroe County courthouse with "citizen's arrest warrants" in hand for President Obama, Pettway, and twenty-two other federal, state, and local officials. Huff filmed as Fitzpatrick attempted to place Pettway and Monroe County Sheriff Bill Bivens under arrest. Law-enforcement officers intervened, removed Huff and Fitzpatrick from a courtroom in the courthouse, and arrested Fitzpatrick. Fitzpatrick's hearing date was set for April 20, 2010.

Huff met with Fitzpatrick following the latter's arrest and, in a subsequent text message to a friend, confirmed that he had "met with the arrested to coordinate with

---

* The Honorable Michael Ryan Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

all groups involved" and said that they were "moving on to Phase 2." On April 15, 2010, Huff told two employees at his local bank in Georgia that on April 20, 2010—the date on which Fitzpatrick's court hearing was scheduled to take place—he planned to "take over" the city of Madisonville with members of the "Georgia Militia." Huff explained that he planned to bring his AK–47s with him and suggested to one employee that she might not see her again. The employees knew Huff because he had been a customer at the bank since 2005 and, concerned that he was serious, each separately contacted law enforcement about his statements.

FBI Special Agent Charles Reed visited Huff at his residence on April 19, 2010, and Huff confirmed that he was planning to go to Madisonville the following day to execute citizen's arrests and "take back" Madisonville. Huff also confirmed that he would be armed with his Colt .45–caliber handgun and would have an AK–47 with him as well, but explained that his group "would not resort to violence unless they were provoked."

On April 20, 2010, the FBI saw Huff leave his Georgia residence and cross into Tennessee, accompanied by Michael Desilva. Huff had his Colt .45 and AK–47 with him, along with about 300 rounds of ammunition.

Several miles outside Madisonville, State Trooper Michael Wilson was on patrol following an FBI briefing concerning a possible threat at the Madisonville courthouse. In the briefing, Wilson learned that people might be coming to Madisonville, "maybe even from the State of Georgia," to "make . . . some type of an arrest on maybe some judges or some government officials." Wilson testified that, driving along the highway, he saw a black pick-up truck with "a large amount of writing on the window" that read, "Oath Keepers," along with a

bumper sticker saying, "Support Your Local Militia" and a Georgia license plate that read, "IM LIT." The vehicle was Huff's. Wilson testified that he pulled the driver over after seeing him commit two traffic infractions—following too closely and running a stop sign—in violation of Tennessee law.

During the stop, Huff told Wilson and the other officers who eventually joined him about the Madisonville campaign that he planned to participate in. Huff showed the officers his "citizen's arrest warrant" for treason and gave them some promotional literature. When the officers asked him to voluntarily surrender his Colt .45, Huff cited his Second Amendment right to carry it but agreed to place it in a toolbox in his trunk out of deference to the officers. Following a lengthy conversation in which Huff appeared to try to recruit the officers to his cause, he proceeded on his way to Madisonville. After he was released, but before he departed, Huff made the following statement: "As a forewarning, if there's enough people gonna show up to this thing, we fully intend to proceed forward with those citizen's arrests. Just so you guys know. And that was the reason why I've got my .45. Because ain't no government official gonna go peacefully." The record is unclear as to why the officers allowed Huff to leave after he made these remarks.

When Huff arrived in Madisonville, he met with a group of about twenty individuals at a restaurant across the street from the courthouse. The group included individuals with firearms at their sides, some of whom pointed at the courthouse, circled it, and photographed it. Over 100 law-enforcement officers were present. They believed that the situation was tense and could have escalated.

Mike Hall, a police lieutenant and then-director of the Tenth Judicial District

Drug Task Force, testified that he was positioned at the restaurant and heard Huff try to "rally" the group with a "motivational speech." Hall said that Huff mentioned that he had an AK–47 with him in his truck with 300 to 400 rounds of ammunition, and that it was a "good day to take over the courthouse." Huff lamented, however, that they "needed more people," and eventually returned home to Georgia.

Huff was arrested ten days later pursuant to a federal warrant. Following a jury trial, he was convicted of transporting a firearm in commerce "knowing or having reason to know or intending that the same w[ould] be used unlawfully in furtherance of a civil disorder." 18 U.S.C. § 231(a)(2).

## II

Huff's first claim on appeal is that the district court erred in denying his motion to suppress the statements obtained from the traffic stop.

In evaluating the denial of a motion to suppress evidence, we review the district court's factual findings for clear error and its conclusions of law de novo. *United States v. Jackson*, 682 F.3d 448, 452 (6th Cir.2012). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir.2009) (quotation marks omitted). We view the evidence "in the light most likely to support the district court's decision." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir.2009) (quotation marks omitted). The "denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *Ibid.* (alterations and quotation marks omitted).

## A

I respectfully disagree with the concurring opinion's determination that Trooper Wilson had probable cause to believe that a traffic violation had occurred. The district court concluded, based on Trooper Wilson's testimony and a videotape of the events, that the stop was constitutional because Wilson had probable cause to believe that Huff had been following the car in front of him too closely, in violation of Tennessee Code Annotated § 55–8–124(a), and also had failed to make a proper stop at a stop sign, in violation of Tennessee Code Annotated § 55–8149(c).

### 1

At the suppression hearing, Wilson asserted that Huff was "following too closely," in violation of Tenn.Code Ann. § 55–8–124(a). The video depicts a tractor-trailer truck exiting the highway with two vehicles behind it—a gray Honda sedan followed by Huff's black GMC pickup truck. Huff's truck momentarily comes "within a car['s] length" of the Honda, as Wilson put it, toward the end of the exit ramp, as all three vehicles stopped before the stop sign. The district court cited Wilson's testimony that Huff "nearly hit the Honda in front of him," *United States v. Huff*, 2011 WL 1429627, at *2 (E.D.Tenn. Apr. 14, 2011), but the video does not depict a near-accident.

Under the statute, a driver may not "follow another vehicle more closely than is reasonable and prudent." § 55–8–124(a). In support of its conclusion that Huff violated the statute, the concurring opinion cites the Tennessee Comprehensive Driver License Manual's "two-second rule" that was in effect when Huff was stopped. Concurring Opinion at 476–77. The manual instructs drivers to identify a stationary point and not to reach it before

"[c]ount[ing] to [themselves] 'one-thousand and one, one-thousands and two.'" 2010 Tenn. Comp. Driver License Manual. However, there is no Tennessee law that characterizes deviating from this instruction as a categorical violation of § 55–8–124(a). Although a manual oftentimes serves as a useful measure of reasonable and prudent driving, the statute, not Tennessee's driving manual, is the basis of the legal test. *Cf. United States v. Muriel,* 418 F.3d 720, 724 (7th Cir.2005) (interpreting similarly worded Indiana statute).

We have previously voiced concern with "the subjective rule of reason in Tennessee on following too closely" and advised that "[t]he circumstances surrounding a stop for following too closely on an expressway within city limits should be examined carefully where there is a challenge based on a pretextual stop." *United States v. Barnes,* 19 F.3d 19 (Table), 1994 WL 75932, at *3 (6th Cir.1994). And in practice, cases in which Tennessee courts have found violations of the statute involve situations, unlike Huff's in this case, where, for a substantial period of time, drivers on a main highway were "following too closely" at relatively high speeds, and left little distance between their car and the car in front of them. *See, e.g., State v. Demcovitz,* 2012 WL 1388482, at *1 (Tenn.Crim. App. Apr. 20, 2012) (traveling on interstate at less than a car's length behind car for almost one mile); *State v. Harton,* 108 S.W.3d 253, 262 (Tenn.Crim.App.2002) (traveling for two miles at 70 miles per hour one to two car's lengths behind truck). The same is true of this court. *See, e.g., United States v. Jimenez,* 446 Fed.Appx. 771, 772 (6th Cir.2011) (traveling 55 miles per hour no more than 24 inches behind tractor trailer); *United States v. Walton,* 258 Fed.Appx. 753, 754 (6th Cir.2007) (traveling between 55 and 70 miles per hour about a car's length and a half behind a tractor trailer). Against that

backdrop, the facts do not indicate that Huff violated the Tennessee statute.

No doubt other circumstances exist— bad weather, poor visibility, or a winding road, for example—under which a driver may reasonably be said to be following another driver "more closely than is reasonable and prudent." But this is not such a case. Huff's truck travelled at a relatively slow speed on the exit ramp as the vehicles in front of it slowed to a stop immediately before a stop sign. In addition, the video shows that Huff drove to within one car's length of the car in front of him for no more than five seconds at a slow and declining speed. It is therefore doubtful whether Huff may reasonably be said to have "followed" the car in front of him at all. The government does not identify any case holding based on a similar set of fact that a driver was "following too closely" in violation of the statute.

In addition, although Wilson testified that Huff stopped suddenly and nearly collided with the car in front of him, the videotape fundamentally discredits his testimony. Based on the video, no reasonable officer could conclude that Huff was travelling at an objectively unsafe distance behind the car in front of him while stopping at the end of the ramp. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts...." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Given the material discrepancies between Wilson's testimony and the video, the district court should not have credited Wilson's version of the events. In view of the foregoing, I cannot hold that Huff violated the Tennessee statute or that Wilson had probable cause to believe that Huff had done so.

## 2

Alternatively, Wilson also claims to have witnessed Huff failing to stop at the exit ramp stop sign, in violation of Tennessee Code Annotated § 55–8–149(c).[1] In this context, "stop" means "complete cessation from movement." Tenn.Code Ann. § 55–8–101(63). In support of its probable-cause finding, the district court cited Wilson's testimony that Huff failed to stop before the "stop line" and made a. " 'brief rolling stop' " through the intersection. *Huff,* 2011 WL 1429627, at *2. "Trooper Wilson opined that this maneuver was not a 'controlled stop' or a 'legal stop.' " *Ibid.*

In light of the record, however, Wilson did not have probable cause to believe that Huff violated § 55–8–149(c). Wilson testified that Huff drove past the stop line, but no stop line is detectable in the video. Rather, the video clearly shows a yellow line on the left and a bright white line on the right demarcating the borders of the road. The magistrate judge was "not able to discern the stop line on the video or on the Defendant's pictures … of the intersection, which were taken on a sunny day some five months after the stop." *United States v. Huff,* 2010 WL 6500732, at *7 (E.D.Tenn. Dec. 6, 2010), *report and recommendation adopted,* 2011 WL 1429627 (E.D.Tenn. Apr. 14, 2011).

As for the stop itself, the video first shows the tractor-trailer truck make the turn. Whether that truck fully stopped is unclear. It then shows the Honda in front of Huff roll through the stop sign without stopping, which Wilson acknowledged. Next, the video shows Huff fully stopped for about a second at 7:09:16 a.m. Wilson testified that Huff "made a less than one second stop at [the] stop sign." Although he acknowledged that the statute does not mandate a minimum stop length, Wilson testified that Huff did not "come to a safe stop."

According to the district court, Wilson had probable cause to believe a violation had occurred because Huff stopped for a second, at most, before entering the intersection, and because the video did not necessarily contradict Wilson's testimony. *Huff,* 2011 WL 1429627 at *5, *7. In reality, however, the video shows Huff stop completely before crossing into the intersection. The district court cited the magistrate judge's observation that "Trooper Wilson was in a better position to determine where the defendant was in relation to the intersection and the stop sign," *id.* at *5, but because the camera provides a fairly complete view of the scene from Wilson's perspective, any advantage Wilson may have had over the camera as to the determination of these particular facts is unclear. Indeed, the video depicts Huff stopping precisely "at the point nearest the intersecting roadway where the driver or operator has a view of approaching traffic on the intersecting roadway before entering the intersection." § 55–8–149(c).

Although there is limited case law on point, probable cause for a § 55–8–149(c) violation usually consists of much stronger evidence. *See, e.g., State v. Edmonds,* 2012 WL 1405917, at *7 (Tenn.Crim.App. Apr. 23, 2012) ("Both officers testified that the Defendant went through the intersection without making any attempt to stop at the stop sign, and the cruiser video show[ed] the Defendant's vehicle going through the intersection at a high rate of speed."); *United States v. Clark,* 2011 WL 2619081, at *1 (E.D.Tenn. Apr. 8, 2011), *report and recommendation adopted,* 2011

---

1. Having found that Huff's following too closely justified the police stop, the concurring opinion has no need to address this alternative argument. As I would not sustain the stop on that basis, I proceed to consider Huff's alternative argument.

WL 2619076 (E.D.Tenn. July 1, 2011) (driver "fail[ed] to make a complete stop at the intersection" and testified that he had "slowed down" but did not stop).

Here, the video and the photographic evidence reviewed by the magistrate judge contradict Wilson's testimony that Huff crossed the stop line without stopping, since they show that no stop line existed. The video also contradicts his testimony that Huff had already rolled into the intersection before stopping and that his stop was objectively unsafe. Instead, it shows a full stop, albeit brief. As a result, I cannot hold that Wilson had probable cause to believe that Huff violated the stop-sign statute. Although it can be tempting to uphold a traffic stop on a dubious record and thus avoid more fraught suppression issues, I simply do not believe this record permits that option.

**B**

Nevertheless, an appeals court may uphold the district court's admission of the evidence on any ground supported by the record. Indeed, we are obligated to do so if the district court's decision to admit the evidence "can be justified for any reason." *Higgins*, 557 F.3d at 389. I would uphold the admission of the statements from the traffic stop on two independent grounds. First, regardless whether Wilson had probable cause to believe that the traffic violations had occurred, he had reasonable suspicion, based on the totality of the circumstances, to believe that Huff might be involved in the Madisonville uprising that Wilson had been warned about that very morning. That suspicion was sufficient to warrant further investigation. Second, because Huff did not volunteer the main incriminating statements admitted at trial until after the stop had ended and he had been sent on his way, the statements need not have been suppressed in any event, as they were not a byproduct of the stop.

**1**

"Reasonable suspicion requires that an officer have articulable reasons and a particularized and objective basis for assuming criminal activity is afoot." *United States v. Tillman*, 543 Fed.Appx. 557, 560 (6th Cir.2013) (quotation marks omitted). "It requires more than just a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir.2006) (quotation marks omitted). Courts making reasonable-suspicion determinations "must look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quotation marks omitted). "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Id.* at 277, 122 S.Ct. 744.

Wilson testified that, prior to Huff's supposed traffic violations, Huff's truck "caught [his] attention" because it "had a large amount of writing" on it. Wilson testified that the words "Oath Keepers" were emblazoned in large writing on the rear window; that the words "not on our watch" were in "big writing" on the bumper; that a bumper sticker on the right rear of the vehicle read, "Support Your Local Militia"; and that the license plate was from the State of Georgia. Wilson further testified that, in his morning briefing, he learned that there was "a lot of intel saying that a group of people were coming from the state of Georgia. It was based like on an organized group. These signs

[on Huff's car] would help you feel like this was maybe some type of organized group." Wilson explained that his briefing that morning involved "multiple law enforcement agencies coming together" due to concerns about "a high potential of a threat that may occur at the courthouse" in Madisonville in view of Fitzpatrick's upcoming trial, including the possibility that this group would "try to make a citizens [*sic*] arrest on some of the officials."

Wilson had been warned that morning of "a high potential of a threat" later that day. He had been warned that the group possibly included visitors from Georgia. It is unclear whether Wilson was explicitly told that the group was ideologically motivated, but, knowing that the threat involved potential citizen's arrests of local officials in connection with Fitzpatrick's trial, Wilson could reasonably have surmised as much. Given this critical background information, Wilson reasonably suspected that Huff, whose truck had Georgia plates and unusual bumper stickers with ideological and possibly violent overtones, might be involved in the threatened courthouse confrontation. In other words, Wilson had "articulable reasons and a particularized and objective basis" for suspecting that Huff could be involved in criminal activity. I recognize that, in a different context, an investigatory stop based in part on the expressions on a vehicle might give rise to First Amendment concerns. But here, those statements must be considered in the context of Wilson's briefing that very morning about events that were to take place the same day. The totality of the circumstances surrounding the stop substantially mitigates any First Amendment concerns I might otherwise have. The connection between Wilson's observations of Huff's truck and Wilson's briefing earlier that morning, though perhaps not enough to establish probable cause, was sufficient to

warrant further investigation and meet the standard of reasonable suspicion under the circumstances. Wilson's decision to stop Huff was not unconstitutional; it was prudent. For that reason, I would uphold the district court's denial of Huff's motion to suppress.

**2**

We also hold that Huff's incriminatory statements would not have been subject to exclusion because the police did not obtain them by exploiting the initial stop.

"The Supreme Court has declined to adopt a 'per se', or 'but for,' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Gross*, 662 F.3d 393, 401 (6th Cir.2011) (internal quotation marks omitted). Rather, as the Court stated in *Wong Sun v. United States*, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quotation marks omitted). "In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken[,] Wong Sun requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (citing *Wong Sun*, 371 U.S. at 486, 83 S.Ct. 407).

Here, Huff's statements were unquestionably voluntary. Trooper Wilson testi-

fied, consistent with the videotape, as follows:

Q. And what happened after [you gave him the warning citations]—well, did you release him at that point? Was he free to go at that point, after you gave him the warnings?

A. As I gave him the warning citations, we handed it to him, I explained to him there wasn't going to be any cost to it. Just shortly, directly after that—and I'm sure we'll see the video and you'll see exactly when I had released him, shook his hand and began walking off.

Q. And then what happened?

A. Mr. Huff had called me. I made approximately three or four steps from him, after I shook his hand. *I said, be careful, be safe, I appreciate you, were the three or four words that I spoke to him. I begin walking off, and he said— he brought up his voice and his hands, and I caught him out of the corner of my eye, and he said, "Let me pre-warn you," and he gave me a very strong statement.* And I stopped and I turned around and I wanted to hear what he had to say. He wanted to talk to me and I wanted to listen.

Q. What did he say? What did he tell you?

A. He said, if—first of all, he said, "Let me pre-warn you," and he looked right at the lieutenant, pointed right at his chest, and said, "and you too." *He said, "If enough of us show up today," he said, "we are going to proceed forward in this citizen's arrest." And he said, "that's why that I have my .45. Ain't no government official going peacefully."* And that's what he had quoted to me.

(emphases added). On cross-examination, defense counsel emphasized (and Wilson agreed) that during the stop, "[Huff] was, the entire time, almost nonstop, talking about the problems in Madisonville and trying to get help from law enforcement." Wilson testified:

Q. Okay. So we're over an hour into the traffic stop when he made that statement [about using his Colt .45 to assist in the citizen's arrests], correct?

A. Yes, sir.

Q. And even then he didn't immediately leave right after that, did he?

A. Correct.

Q. He stayed there and talked some more to you guys that were there on the scene, didn't he?

A. Yes, sir.

Q. Even though he was free to go, didn't he?

A. Yes, sir.

Q. And talked and talked and talked and talked, didn't he?

A. Yes, sir.

Q. Still trying to recruit you, wasn't he?

A. Yes, sir. Educate us and recruit us.

Huff had already been released and was free to go on his way before calling out to the officers and returning to them to make the key incriminating statements from the stop that were admitted against him at trial. The statements did not follow an interrogation nor were they prompted by the officers in any way; rather, they were volunteered following a lengthy, rather amicable conversation, in which Huff did most of the talking, on topics ranging from Huff's recruitment efforts to the Bible.

In addition to being voluntary, the statements must have been "sufficiently an act of free will to purge the primary taint" in order to have been properly admitted. Our precedents on point typically involve circumstances analogous to those in *Brown*, in which the statements admitted at trial were made while the defendant was

in custody following an allegedly unlawful arrest or search. *See Brown,* 422 U.S. at 604–05, 95 S.Ct. 2254. In *Brown,* the Supreme Court identified four factors to consider, in addition to voluntariness, in determining whether statements were purged of the taint of an unlawful search or seizure: the giving of *Miranda* warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *United States v. Wolfe,* 166 Fed.Appx. 228, 232–33 (6th Cir.2006) (citing *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254).

Here, Huff was never arrested or taken into custody, so a *Miranda* warning was not warranted. The temporal-proximity factor appears, at first blush, to cut against admissibility, since Huff's statements were made just over an hour after the stop was initiated, and just seconds after it had come to an end. In *Brown,* for example, the fact that "less than two hours passed between [the] unlawful arrest and post-*Miranda* confession weighed against dissipation." *United States v. Williams,* 615 F.3d 657, 669 (6th Cir.2010) (citing *Brown,* 422 U.S. at 604 & n. 11, 95 S.Ct. 2254). But temporal proximity is not, in itself, a particularly weighty factor, in part because the passage of time is as likely to militate against admissibility as it is to support it. *See United States v. Shaw,* 464 F.3d 615, 628 (6th Cir.2006) ("The fact that both parties seem confused as to whether the passage of a greater or lesser amount of time would help their respective positions supports Justice Stevens' assessment [in his concurrence in *Dunaway v. New York,* 442 U.S. 200, 220, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)] regarding the ambiguity of this factor."). For example, although a prolonged detention may be further removed from any illegality, it may also have "exploitative and coercive effects." *Ibid.* (holding that "the length of

the detention, and particularly the fact that Shaw was interrogated for approximately eleven of the twenty hours he was held, [did] not weigh in favor of" admissibility); *see also United States v. Baldwin,* 114 Fed.Appx. 675, 684 (6th Cir.2004) ("[I]f there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one."); *cf. Gross,* 662 F.3d at 402 (holding that the two months "that elapsed between the unlawful seizure of Gross in the parked car and Gross's subsequent voluntary confession" weighed in favor of admissibility). Given its equivocality, "the temporal factor must be considered in conjunction with any intervening circumstances." *Shaw,* 464 F.3d at 628.

We thus turn to the third *Brown* factor: intervening circumstances. In *Wong Sun,* the Supreme Court held that, given "the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, ... the connection between the arrest and the statement had become so attenuated as to dissipate the taint." *Wong Sun,* 371 U.S. at 491, 83 S.Ct. 407 (quotation marks omitted). We have found attenuation even where the suspect remained in custody as a result of an unlawful seizure. *See Gross,* 662 F.3d at 406 (finding attenuation where "DNA evidence was obtained several days after [the initial unlawful seizure] and only upon the issuance of a search warrant"). On the other hand, we have declined to find sufficient intervening circumstances where "[t]here was no intervening time or event between the illegal arrest and defendants' consent" to a search, *United States v. Lopez–Arias,* 344 F.3d 623, 630 (6th Cir.2003), and where a defendant's "statements were made ... in the immediate aftermath of his illegal arrest," *United*

*States v. Watson,* 489 Fed.Appx. 922, 928 (6th Cir.2012).

The question here is whether the officers' termination of the stop and Huff's release constitute sufficient intervening circumstances to purge his subsequent statements of any illegality. In *Wong Sun,* the Supreme Court found it critical "that Wong Sun had been released on his own recognizance after a lawful arraignment." 371 U.S. at 491, 83 S.Ct. 407. And we have cited release from custody as an example of a sufficient intervening circumstance. *See Shaw,* 464 F.3d at 630 (citing *United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1300 (9th Cir.1988) for the proposition that "a defendant's subsequent release" may be sufficient to break the causal connection to the initial illegality). Although the amount of time that elapsed between Huff's release and his statements here is far less than that which elapsed between Wong Sun's release and his confession, unlike Wong Sun, Huff was never arrested, charged, or even threatened with arrest. Nor was he confronted with incriminating evidence derived from a search; Huff had refused to allow the officers to search his vehicle, and they acceded to his refusal. Under the circumstances, the amount of time needed to dissipate any taint from the initial traffic stop would have been far less than that in *Wong Sun,* particularly given the conversational tone of the exchanges that preceded Huff's release—exchanges that Huff was largely responsible for instigating and perpetuating.

In addition, we note that the Supreme Court, in *Wong Sun,* and this court, in *Gross,* found attenuation despite the fact that the defendants in those cases knew that they were facing criminal proceedings when the incriminating evidence was obtained—proceedings they would not have faced in the absence of the initial Fourth Amendment violation. Here, in contrast, Huff had no belief that he was facing criminal charges at the time he made his statements. This substantially reduces the risk that the statements were not sufficiently the product of his own free will.

Finally, we consider the purpose and flagrancy of any possible police misconduct. On these facts, it seems plausible that, like the police in *Brown,* Wilson's purpose in stopping Huff was "for investigation" unrelated to Huff's alleged traffic infractions. *Brown,* 422 U.S. at 605, 95 S.Ct. 2254 (quotation marks omitted). Unlike in *Brown,* however, the officer here had reasonable suspicion under the circumstances to warrant investigation. And even in the absence of reasonable suspicion, any misconduct was not flagrant—it was not "calculated to cause surprise, fright, and confusion," in contrast with *Brown. Ibid.*

We hold that, under the circumstances, Huff's release was sufficient to break any causal connection between his initial stop and his parting comments. We think it is critical that Huff volunteered his final incriminating statements unprompted by any questioning, or even indirectly prompted by detention. It is telling that, when Huff walked back toward the officers, he pointed his finger at them, in a gesture that might almost be considered threatening. Huff had been released, and all he faced was the open road before him. The police cannot be said to have "exploited" an illegality to "obtain" these statements that were entirely unsolicited, unexpected, and unprompted in any way. We employ the exclusionary rule to deter law enforcement from violating the Fourth Amendment. Here, however, there is little risk that police officers will stop individuals unlawfully in the hope that, when a given stop is over and the individual is released, he will voluntarily return and

incriminate himself. We have no doubt that Huff's statements were made entirely of his own free will. Accordingly, we uphold the district court's admission of the statements at trial.

## III

Huff's next claims on appeal are that the statute under which he was convicted is unconstitutional because it a) exceeds the scope of Congress's authority under the Commerce Clause, b) is overbroad, in violation of the First and Second Amendments, and c) is impermissibly vague, in violation of the Fifth Amendment right to due process.

We review questions concerning the constitutionality of a statute de novo. *United States v. Coleman*, 675 F.3d 615, 619 (6th Cir.2012).

## A

Article I, Section 8, Clause 3 of the United States Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Supreme Court "ha[s] identified three broad categories of activity that Congress may regulate under its commerce power." *United States v. Lopez*, 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, those activities that substantially affect interstate commerce...." *Id.* at 558–59, 115 S.Ct. 1624 (citations omitted).

The statute in question, by its terms, regulates anyone who "transports or manufactures for transportation in commerce any firearm," 18 U.S.C. § 231(a)(2), where "commerce" is defined as "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia," 18 U.S.C. § 232(2).

We hold that the statute is a valid exercise of the commerce power pursuant to both the first and second *Lopez* categories. First, as required for category one, the statute regulates "the use of the channels of interstate commerce." Under the statute, those channels may not be used for the transportation of firearms, where those firearms are to be used in furtherance of a "civil disorder," as that term is defined. Huff argues that the activity that the statute regulates is criminal rather than commercial in nature, and that the activity therefore does not fall within the scope of Congress's regulatory power. But as this court explained in *Coleman*, "[t]he 'commerce' that Congress may regulate through the first *Lopez* prong is not limited to economic matters, but rather may encompass using the channels of interstate commerce to bring the spread of any evil or harm to the people of other states from the state of origin." 675 F.3d at 620 (quotation marks omitted). In other words, the question under the first *Lopez* category is essentially whether the channels of interstate commerce are being used; whether their use has any direct connection to commerce is irrelevant. Here, the statute concerns the transportation of a firearm through those channels. The statute thus comports with the requirements of the Commerce Clause.

The statute also falls within the second *Lopez* category, under which Congress may regulate "persons or things" in interstate commerce. Huff was a "person," and his firearm, a "thing," in interstate commerce. *See Coleman*, 675 F.3d at 621 ("When Coleman traveled across state lines, he became a 'person . . . in interstate commerce.' ").

As the government notes, we have consistently rejected analogous challenges to 18 U.S.C. § 922(g), which makes it unlawful for certain individuals to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." For example, in *United States v. Henry*, we held that "a § 922(g)(1) conviction comports with the Commerce Clause so long as the defendant possessed a gun that previously had moved in interstate commerce." 429 F.3d 603, 619 & n. 20 (6th Cir.2005) (quotation marks omitted). The same logic that allows Congress to regulate firearms in interstate commerce under § 922(g) applies to § 231(a)(2).

In sum, the law is a valid exercise of Congress's power because it regulates the use of the channels of interstate commerce and persons and objects therein.

## B

Huff also challenges the statute as being facially overbroad, in violation of the First and Second Amendments. We review these challenges in turn.

## 1

Huff first contends that § 231(a)(2) is overbroad "because it reaches a substantial amount of protected conduct"—that is, it impermissibly infringes upon his "rights of speech and association under the First Amendment." Appellant's Br. at 44.

A statute may be overbroad if "it prohibits a substantial amount of protected speech," *United States v. Williams*, 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008), or if it "ensnare[s] . . . innocent associations" by its "broad sweep," *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In order to determine whether a particular statute is overbroad, we must first "construe the challenged statute . . . [to] know[ ] what the statute covers." *Williams*, 553 U.S. at 293, 128 S.Ct. 1830. "We [then] turn to whether the statute, as we have construed it, criminalizes a substantial amount of protected expressive activity." *Id.* at 297, 128 S.Ct. 1830. Because a successful overbreadth challenge "suffices to invalidate *all* enforcement of [the] law [in question]," *Virginia v. Hicks*, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003), "[i]nvalidation for overbreadth is strong medicine that is not to be casually employed," *Williams*, 553 U.S. at 293, 128 S.Ct. 1830 (quotation marks omitted).

We decline to find § 231(a)(2) overbroad. Consider first Huff's argument that the statute infringes upon his freedom of speech. This is a remarkable claim, considering that § 231(a)(2) does not target speech at all. The law's purpose is to regulate conduct; namely, to criminalize the "transport[ation] . . . [of a] firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder." § 231(a)(2). "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrat-

ing)." *Hicks,* 539 U.S. at 124, 123 S.Ct. 2191.

Huff appears to concede this point—i.e., that the statute does not directly criminalize speech—but nonetheless insists that the statute does target protected conduct. We disagree. The statute targets those who know, have reason to know, or intend that a transported firearm will be used *unlawfully.* Unlawful conduct is not protected conduct. The First Amendment does not give individuals the right to break a generally applicable law for expressive purposes. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,* 547 U.S. 47, 65–66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) ("[W]e reject[ ] the view that conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea.") (quotation marks omitted). Nor can Huff claim that he was somehow caught off guard by the statute's scope: it applies only to those who "know[ ] or hav[e] reason to know or intend[ ]" that the firearm they transport "will be used unlawfully." § 231(a)(2).

This is particularly true in this case, where the district court found that Huff "possessed firearms and ammunition with the knowledge or intent that such would be used or possessed in connection with aggravated assault as defined by Tennessee law." R. 197 (Dist. Ct. Opin. & Order at 14) (Page ID # 1261); *see also* Tenn. Code Ann. § 39–13–102(a)(1)(A)(iii); Tenn. Code Ann. § 39–13–101(a)(3) (prohibiting, as "aggravated assault," using or displaying a deadly weapon in connection with an assault, where assault is defined to include

"intentionally caus[ing] physical contact with another" that a "reasonable person would regard . . . as extremely offensive or provocative").

■ Huff's freedom-of-association claim is similarly unavailing. Again, nothing in the statute prevents Huff from expressly associating with those who might share his beliefs. In fact, nothing in the statute prevents him from bringing firearms to such an assembly. The statute's scope is more circumspect: it proscribes the transportation of a firearm to be "used *unlawfully* in furtherance of a civil disorder." § 231(a)(2) (emphasis added). The same principle that we elucidate above applies here: the freedom of association does not give a party protection over otherwise unlawful behavior.

Because § 231(a)(2) does not target speech and because it reaches only unlawful (i.e., not protected) conduct, the statute does not implicate either protected speech or protected associational rights—let alone implicate them in a "substantial" way. Huff's First Amendment overbreadth challenge fails.

### 2

■ Huff did not raise his Second Amendment claim before the district court.[2] That means that we review his claim now for plain error, which requires us to determine whether there was "an error or defect" below, whether the error was "clear or obvious," and whether the error "affected [Huff's] substantial rights." *Puckett v. United States,* 556 U.S. 129,

---

**2.** In a motion before the district court challenging the charges brought against him for being vague and overbroad, Huff mentioned the Second Amendment only once, in the penultimate sentence of his fifteen-page motion. *See* R. 33 (Mot. to Dismiss Indictment at 14) (Page ID # 142) ("The rights protected by the First and Second Amendments are infringed upon by both the breadth and vagueness of 18 U.S.C § 231."). The rest of the motion focused exclusively on Huff's First Amendment challenge; Huff did not cite a single case or document to support a Second Amendment challenge. We do not construe this stray comment as a properly developed argument raised before the district court.

135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). If these three requirements are met, then we have discretion to remedy an error but "only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Ibid.* (quotation marks and alteration omitted). Huff fails to clear this bar. Huff's contention—that "[c]riminalization of the mere 'transport' of a firearm, as provided in Section 231(a)(2), is an overly broad reach into ... an individual's ability to possess a firearm," Appellant's Br. at 44—misstates what actually happened in this case. Huff did not merely transport a firearm. He transported several firearms "knowing or having reason to know or intending that [they would] be used unlawfully in furtherance of a civil disorder." § 231(a)(2). As the Supreme Court has made clear, the Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation." *District of Columbia v. Heller,* 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). It certainly does not protect the right of citizens to carry arms for an *unlawful* confrontation.

In any event, Huff's overbreadth challenge also fails the second step of plain-error analysis—i.e., that the error be clear or obvious. The Supreme Court has "not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Nor have we. *See United States v. Blaszak,* 349 F.3d 881, 888 (6th Cir.2003) ("The overbreadth doctrine is an exception to traditional rules of standing and is applicable only in First Amendment cases....") (quotation marks omitted). More to the point, "no circuit has accepted an overbreadth challenge in the Second Amendment context." *United States v. Chester,* 514 Fed.Appx. 393, 395 (4th Cir.2013). Under plain-error review,

we reject Huff's claim that § 231(a)(2) violates the Second Amendment.

**C**

■ In his final challenge to the constitutionality of the statute, Huff argues that the statute violates his right to due process because it is impermissibly vague. He contends that the statute is vague for four reasons: (1) it is obscure and rarely enforced, (2) the words "having reason to know" are vague, (3) the word "unlawfully" is vague, and (4) the term "civil disorder" is vague.

**1**

Huff's first argument is that the "obscurity of [Section 231(a)(2) ]" and "the lack of case law construing Section 231(a)(2)" mean that "an ordinary person would not be on notice that his conduct would implicate criminal liability." Appellant's Br. at 45. We disagree. Calling something an obscure crime does not make it so. To be sure, we have recognized that a law may be "so technical or obscure [as to] threaten[ ] to ensnare individuals engaged in apparently innocent conduct." *United States v. Baker,* 197 F.3d 211, 219 (6th Cir.1999). We have also recognized that, in certain situations, such laws may violate a defendant's right to due process. *Ibid.* But we have already discussed why § 231(a)(2) does not "threaten to ensnare individuals engaged in apparently innocent conduct"—the statute is not, as we have stated, overly broad. We reiterate that reasoning here. In fact, if anything, our inquiry into § 231(a)(2)'s alleged vagueness requires us to be even more circumspect. *See Holder v. Humanitarian Law Project,* 561 U.S. 1, 18–19, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) ("We consider whether a statute is vague *as applied to the particular facts at issue,* for a plaintiff who engages in some conduct that is clear-

ly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.") (quotation marks omitted and emphasis added). The facts at issue clearly demonstrate that Huff violated § 231(a)(2): he transported firearms through interstate commerce, "knowing or having reason to know or intending" that they would be used "unlawfully in furtherance of a civil disorder"—i.e., by attempting forcibly to effectuate citizen's arrests of various government officials.

We turn next to the alleged lack of case law. We find this characterization inapt. Section 231(a)(2) was enacted as part of the Civil Obedience Act of 1968. A number of courts have interpreted and applied the other provisions in § 231— § 231(a)(1) and § 231(a)(3), which govern similar conduct. *See, e.g., United States v. Featherston,* 461 F.2d 1119, 1121 (5th Cir.1972) (holding that the mens rea requirement of § 231(a)(1) is neither vague nor overbroad), *cert. denied,* 409 U.S. 991, 93 S.Ct. 339, 34 L.Ed.2d 258 (1976); *United States v. Mechanic,* 454 F.2d 849, 852 (8th Cir. 1971) (holding that § 231(a)(3), which prohibits interference with law enforcement, "has no application to speech, but applies only to violent physical acts"); *Nat'l Mobilization Comm. to End War in Viet Nam v. Foran,* 411 F.2d 934, 937 (7th Cir.1969) (finding § 231(a)(3) not to be vague). In addition, a number of states have passed similar statutes, modeled after the language in § 231. *See* Joelle E. Polesky, Comment, *The Rise of Private Militia: A First and Second Amendment Analysis of the Right to Organize and the Right to Train,* 144 U. Pa. L.Rev. 1593, 1609 n. 70 (1996) ("[T]he Civil Obedience Act of 1968 ... [is] the federal statute upon which many ... state statutes were based."). Finally, on the issue of enforcement, it appears that the government has in ·fact brought charges against other individuals for violating § 231. *See* Dep't of Justice, *Militia Members Planning Destruction of Government Buildings Arrested in Arizona,* DOJ 96321, 1996 WL 363676 (July 1, 1996) ("Six of the 12 were also charged with conspiracy and a substantive violation of 18 U.S.C. 231 ...."). To summarize: courts have applied § 231, states have adopted statutes modeled after § 231, and the government has indicted individuals for violating § 231. Huff was not deprived of constitutionally adequate notice that his behavior was illegal.

2

Huff's next contention is that the statute is vague because the mens rea requirement "having reason to know" is vague. Huff offers no additional explanation behind his contention. The Fifth Circuit rejected this very same challenge, in the context of the identical mens rea requirement in § 231(a)(1). *Featherston,* 461 F.2d at 1121. The Seventh Circuit did the same, in the context of § 231(a)(3). *Foran,* 411 F.2d at 937. We see no reason why we should not do the same with respect to § 231(a)(2).

3

Third, Huff claims that the statute is vague "because it does nothing to limit the application of the statute in regard to what constitutes unlawful conduct." Appellant's Br. at 46. This argument does no more than recast Huff's overbreadth challenge, which we have already rejected. As we have made clear, the term "unlawfully" in § 231(a)(2) is not ambiguous. Moreover, Huff's conduct was plainly unlawful. He stated to law enforcement officials that he planned to use his Colt .45–caliber handgun to effectuate citizen's arrests in Madisonville. Such acts violate Tennessee law, as they constitute aggravated assault. We reject this void-for-vagueness challenge.

**4**

Finally, Huff claims that the term "civil disorder" is vague because "it would allow a person to be found criminally liable without any requirement that such person cause or associate with those who cause the 'public disturbance' referenced in the statute." Appellant's Br. at 46.

Again, we disagree. First, Huff's claim is wholly untethered from the actual text of the statute. The statute requires that the defendant know, have reason to know, or intend that the firearm "will be used unlawfully *in furtherance* of a civil disorder." § 231(a)(2) (emphasis added). That *is* a requirement that the person "cause or associate with those who cause the 'public disturbance,'" notwithstanding Huff's contentions otherwise. Huff also fails to mention that § 232(1) provides a specific definition for "civil disorder": "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." That definition helps delineate the scope of § 231(a)(2). And again, § 231(a)(2) does not ensnare the innocent, as it applies only to *unlawful* conduct—here, Huff's attempted aggravated assault.

In sum, we reject Huff's void-for-vagueness argument in all respects.

**IV**

We turn to Huff's objection to the superseding indictment, which Huff claims was constitutionally deficient.

We review the sufficiency of an indictment de novo. *United States v. McAuliffe,* 490 F.3d 526, 531 (6th Cir.2007). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second,

enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). "An indictment will usually be sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense." *United States v. Superior Growers Supply, Inc.,* 982 F.2d 173, 176 (6th Cir.1992). "However, the recitation of statutory language must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *McAuliffe,* 490 F.3d at 531 (quotation marks omitted). When the indictment references a "legal term of art" defined in the statute, such a term is "sufficiently definite in legal meaning to give a defendant notice of the charge against him." *Hamling,* 418 U.S. at 118, 94 S.Ct. 2887. "An indictment is to be construed liberally in favor of its sufficiency." *McAuliffe,* 490 F.3d at 531.

■ Count One of the indictment charged as follows: "On or about April 20, 2010, in Monroe County, in the Eastern District of Tennessee and elsewhere, the defendant DARREN WESLEY HUFF did transport in commerce a firearm, knowing and having reason to know and intending that such firearm would be used unlawfully in furtherance of a civil disorder. In violation of Title 18, United States Code, Section 231(a)(2)." Appellee's Br. at 50. As the government notes, the language of the indictment "tracks verbatim the language of 18 U.S.C. § 231(a)(2) and identifies with precision the date and location of Defendant's offense as well as the specific statute his conduct violated." *Ibid.*

Huff objects that the indictment failed to set forth numerous facts related to the

charge, including the nature of the alleged "public disturbance," who was involved, how the transportation "in commerce" occurred, why it satisfied the requirements of the Commerce Clause, facts showing that Huff possessed the requisite mens rea, facts showing what made the transportation unlawful, and facts specifying which of Huff's firearms was involved. As the case law makes clear, however, the indictment need not have set forth any of this information. The indictment first had to state the elements of the offense, which it did. Second, it had to inform Huff of "the specific offense, coming under the general description, with which he [was] charged," which it also did: the indictment identified the date and location of the alleged violation, and there is no ambiguity as to the factual circumstances that it was referencing. Indeed, Huff does not allege that he was not aware that the charge related to his attempt to "take over" Madisonville on April 20, 2010.

The date and location identified in the indictment were sufficient to inform Huff of the nature of the facts and circumstances surrounding the offense with which he was charged so as to enable him to a) mount a defense and b) plead an acquittal or conviction, had he chosen to do so, as a bar to future prosecutions for the same offense. The indictment passed constitutional muster.

## V

We turn to Huff's objection concerning the sufficiency of the evidence. Evidence is sufficient to support a conviction if, "after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We are "bound to make all reasonable inferences and credibility choices in support of the jury's verdict," *United States v. Newsom,* 452 F.3d 593, 608 (6th Cir.2006), and must "refrain from independently judging the weight of the evidence." *United States v. Suarez,* 263 F.3d 468, 476 (6th Cir.2001).

We first reiterate the elements of the offense. An individual is liable under the statute if he "transports ... in commerce any firearm ... knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder." 18 U.S.C. § 231(a)(2). "The term 'civil disorder' means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). We address the evidence with respect to each element in turn.

■ The evidence was sufficient to support a finding that Huff transported a firearm in interstate commerce, from Georgia to Tennessee. Trooper Wilson testified, and the in-cruiser videotape confirmed, that Huff had his Colt .45–caliber handgun with him and acknowledged having an AK–47 with him in his truck. He told the bank employees that he was bringing AK–47s with him and made a similar comment to FBI Special Agent Reed before he left Georgia, and he told the crowd in Madisonville that he had an AK–47 in his truck.

The evidence was also sufficient to show that he transported the firearms intending to use them unlawfully in furtherance of a civil disorder. The bank employees in Georgia each testified that, five days before the crime, Huff told them that he planned to "take over" Madisonville with other members of the "Georgia Militia." That is the context in which Huff said that he would be transporting his AK–47s. He communicated the same plan to Special

Agent Reed the day before departing for Madisonville. And after being stopped on the highway by Trooper Wilson, Huff distributed promotional literature to the officers on the scene, insisted on keeping his weapons, and said, in a parting statement: "As a forewarning, if there's enough people gonna show up to this thing, we fully intend to proceed forward with those citizen's arrests. Just so you guys know. And that was the reason why I've got my .45, because ain't no government official gonna go peacefully." Though Huff did not seem to want to resort to outright violence, he also said, "If it comes to that I've got to fight you guys, I have no choice." In Madisonville, Huff met with about twenty other individuals, some of whom were armed, including individuals who circled and photographed the courthouse. The evidence was sufficient to enable a rational trier of fact to conclude that Huff intended to use his firearms to further a civil disorder—that is, to further a public disturbance knowing that the disturbance involved acts of violence and presented an imminent danger of risk or injury. Finally, the evidence was sufficient to enable a rational trier of fact to conclude that Huff at least "had reason to know" that such a use was unlawful. That is, a juror could have reasonably found that Huff knew or had reason to know that using his firearms to effectuate unauthorized arrests of government officials was not lawful in Tennessee.

In light of the evidence presented at trial, a rational trier of fact could have found Huff guilty of the crime with which he was charged.

## VI

Huff's final claim is that his sentence was a) procedurally unreasonable, because the guideline on which the district court based its sentence did not apply, and b) substantively unreasonable, because his conduct warranted a lower sentence than the sentence he received.

We review criminal sentences for procedural and substantive reasonableness under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 41, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). We "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Id.* at 51, 128 S.Ct. 586. If we find that the court's decision was procedurally sound, we then consider the substantive reasonableness of the sentence. *Ibid.* In so doing, we recognize that, because the sentencing judge "sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record," he is "in a superior position to find facts and judge their import under § 3553(a)." *Ibid.*

### A

■ Under the Guidelines, where the "offense is a felony for which no guideline expressly has been promulgated," the sentencing judge is to apply "the most analogous guideline" in calculating the defendant's Guidelines range. USSG § 2X5.1. No guideline has been promulgated for a violation of § 231(a)(2). The district court therefore consulted § 2K2.1 as the most analogous guideline, a section entitled, "Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition." The parties agree

that Huff's base offense level under the Guidelines was properly determined in light of § 2K2.1(a)(7), which provides that the base offense level for the "unlawful receipt, possession, or transportation of firearms or ammunition" is "12, except as provided below." Application Note 4 to that section explains:

> Subsection (a)(7) includes the interstate transportation or interstate distribution of firearms, which is frequently committed in violation of state, local, or other federal law restricting the possession of firearms, or for some other underlying unlawful purpose. In the unusual case in which it is established that neither avoidance of state, local or other federal firearms law, nor any other underlying unlawful purpose was involved, a reduction in the base offense level to no lower than level 6 may be warranted to reflect the less serious nature of the violation.

U.S.S.G. § 2K2.1, comment. (n. 4). Since Huff's crime involved "some other underlying unlawful purpose," the district court's decision to apply § 2K2.1(a)(7) was appropriate.

Huff objects not to the decision to apply § 2K2.1(a)(7) but to the way in which it was applied. Again, the section in question provides that the base offense level is "12, except as provided below." The district court looked "below," and, as relevant to this appeal, found two relevant provisions for consideration. Its findings and conclusions were consistent with those set forth in the Presentence Investigation Report ("PSR").

First, under § 2K2.1(b)(6)(B), if the defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense," the court was to increase the defendant's offense level four levels, and, if the resulting offense level was less than 18, to 18. The court found that the provision applied to Huff and increased his base offense level of 12 to 18.

Second, the court was required to cross-reference its determination as follows:

> If the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed in connection with another offense, apply ... § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above....

USSG § 2K2.1(c)(1). The court found that the facts of Huff's case easily satisfied the requirements of the provision, which parallel the elements of his crime. As required, the court then compared the resulting offense level under § 2K2.1 (level 18) with that which would result under § 2X1.1 in connection with the contemplated other offense, applying the greater of the two. Under the Guidelines, " '[a]nother offense', for purposes of subsection (c)(1), means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, regardless of whether a criminal charge was brought, or a conviction obtained." USS.G § 2K2.1, comment. (n. 14(c)).

Applying the cross-reference provision consistent with the recommendation in the PSR, the district court determined that Huff intended that the firearm be used in connection with the "other offense" of aggravated assault. The court declined to apply the guideline for aggravated kidnapping, but because neither party contests the court's decision in that respect, we do

not address it here. Huff's base offense level under the guideline for aggravated assault, USSG § 2A2.2, was 14. Because cross-reference provisions refer to the entire cross-referenced guideline, including enhancements, *see* USSG § 1B1.5(a), the court then applied a two-level enhancement for an assault that involved "more than minimal planning," *see* § 2A2.2(b)(1), and a three-level enhancement for an assault in which "a dangerous weapon (including a firearm) was brandished or its use was threatened," *see* § 2A2.2(b)(2)(C), for an offense level of 19. The court then compared the offense level that resulted under § 2K2.1 (level 18) and § 2A2.2 (level 19) and, as instructed under § 2K2.1(c), chose the greater of the two, namely, the offense level of 19 for attempted aggravated assault.

The court then applied a six-level enhancement, pursuant to USSG § 3A1.2(b), because the intended victims were government officials, and a two-level enhancement, pursuant to USSG § 3C1.1, because Huff obstructed or impeded the administration of justice by lying to law enforcement about certain statements that he had made. His total offense level was thus increased to 27. That total offense level, combined with Huff's criminal history category of I, resulted in a Guidelines range of 70 to 87 months of imprisonment. Huff's sentence was capped at 60 months, however, which is the statutory maximum penalty for a violation of 18 U.S.C. § 231(a)(2).

Huff argues that, because he did not attempt or commit aggravated assault, the district court erred a) in its application of § 2K2.1(b)(6)(B), enhancing his tentative offense level to 18 for use of a firearm in connection with a felony, and b) in its application, in the alternative, of the aggravated-assault guideline (§ 2A2.2) and the enhancements thereunder, resulting in an offense level of 19. These enhancements would not have applied had the district court not determined that Huff attempted to commit a felony, and in particular, the felony of aggravated assault. It is unclear whether the six-level enhancement for "official victims" would have applied.

Regardless, the district court's finding that Huff attempted aggravated assault and should be sentenced accordingly was reasonable. The Tennessee statute criminalizing "aggravated assault" provides:

(a)(1) *A person commits aggravated assault who:*

(A) *Intentionally or knowingly commits an assault as defined in § 39–13–101, and the assault:*

(i) Results in serious bodily injury to another;

(ii) Results in the death of another;

(iii) *Involved the use or display of a deadly weapon;* or

(vi) Was intended to cause bodily injury to another by strangulation or bodily injury by strangulation was attempted; or

(B) Recklessly commits an assault as defined in § 39–13–101(a)(1), and the assault:

(i) Results in serious bodily injury to another;

(ii) Results in the death of another; or

(iii) Involved the use or display of a deadly weapon.

Tenn.Code Ann. § 39–13–102(a)(1) (emphases added). Tennessee defines "assault" as:

(1) Intentionally, knowingly or recklessly caus[ing] bodily injury to another;

(2) *Intentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury;* or

(3) *Intentionally or knowingly caus[ing] physical contact with another*

*and a reasonable person would regard the contact as extremely offensive or provocative.*

Tenn.Code Ann. § 39–13–101(a) (emphases added). The evidence showed, and the district court reasonably found, that Huff intended to use his firearm ("use or display a deadly weapon") to effectuate citizen's arrests of government officials ("intentionally or knowingly cause physical contact with another" that "a reasonable person would regard as . . . extremely offensive or provocative," or "intentionally or knowingly cause another to reasonably fear imminent bodily injury"). *See United States v. Huff*, 2012 WL 1565442 at *6–7 (E.D.Tenn. May 2, 2012). To effectuate an arrest of a public official in this fashion would almost certainly require either "offensive or provocative" physical contact or causing "fear" or "imminent bodily injury." Accordingly, the district court did not err in finding that Huff attempted aggravated assault, nor did it err in its decision to apply the appropriate enhancements under the Guidelines in connection with that offense.

## B

Huff's final argument on appeal is that his sentence was substantively unreasonable because his conduct was not severe enough to warrant a forty-eight-month term of imprisonment.

The Supreme Court permits a court of appeals "to apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines." *Rita v. United States*, 551 U.S. 338, 347, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). "[T]he courts of appeals' 'reasonableness' presumption, rather than having independent legal effect, simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." *Id.* at 350–51, 127 S.Ct. 2456. In this circuit, we apply a rebuttable presumption of reasonableness to sentences within the Guidelines range. *See United States v. Vonner*, 516 F.3d 382, 389 (6th Cir.2008) (en banc). For sentences below that range, the presumption of reasonableness is at least as strong, if not stronger. *See United States v. Castaneda–Comacho*, 421 Fed.Appx. 604, 606 (6th Cir. 2011).

The district court appropriately calculated the initial Guidelines range to be 70 to 87 months of imprisonment, but because the statutory maximum sentence for the offense of which Huff was convicted is five years, or 60 months, the Guidelines range was 60 months. *See United States v. Williams*, 512 Fed.Appx. 594, 601 (6th Cir.2013) (holding, in an analogous context, that "where a mandatory minimum sentence applies that exceeds the otherwise applicable guideline range, the mandatory minimum sentence becomes the applicable guideline range."). The court then recited and applied the sentencing factors that it was required to evaluate under § 3553(a). In its thorough discussion, the court appeared to take into account all relevant considerations, including factual circumstances concerning the defendant and the nature of the offense. The court sentenced Huff to a below-Guidelines-range sentence of 48 months of imprisonment, to be followed by two years of supervised release.

Huff contends that he deserves a lesser sentence because he is "being punished for thinking bad thoughts while driving around (legally) with guns." Appellant's Br. at 62. But that is not what the offense he was convicted of requires and it is not what the district court found. Instead,

Huff was convicted of "driving around with guns" with the intent to use them *illegally*.

"The district court is entitled to deference in its sentencing decisions because of its ringside perspective on the sentencing hearing and its experience over time in sentencing other individuals." *United States v. Rossi*, 422 Fed.Appx. 425, 437–38 (6th Cir.2011) (alterations and quotation marks omitted). Huff has not rebutted the presumption that the district court's sentence was reasonable.

## VII

Huff's claims for relief are DENIED and the judgment of the district court is AFFIRMED.

BARRETT, District Judge.

While I concur that the district court did not err in denying the motion to suppress the statements obtained from the traffic stop, I write separately to address the issue of whether there was probable cause for the stop.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir.2012) (quoting *United States v. Blair*, 524 F.3d 740, 748 (6th Cir.2008)); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Any evidence obtained during an illegal traffic stop must ordinarily be suppressed as fruit of the poisonous tree. *Jackson*, 682 F.3d at 453; *see also Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

In analyzing the constitutional validity of a vehicular traffic stop, this circuit has developed two tests: "an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Blair*, 524 F.3d at 748; *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n. 6 (6th Cir.2004); *see also United States v. Tullock*, 578 Fed.Appx. 510, 513 (6th Cir.2014). Reasonable suspicion requires less than a preponderance of the evidence, a significantly less challenging standard to meet than probable cause. *United States v. Valdez*, 147 Fed.Appx. 591, 595 (6th Cir.2005) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Although "virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation" this court is bound by the controlling authority of prior decisions of this court unless the Supreme Court issues an inconsistent decision or this court en banc overrules prior decisions. *United States v. Simpson*, 520 F.3d 531, 540–41 (6th Cir. 2008). This court applies the probable cause standard here because both parties' arguments hinge upon whether or not Defendant committed a traffic violation, a civil infraction.

Probable cause exists where an officer has "a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion" *Blair*, 524 F.3d at 748. Probable cause does not require an actual finding of a violation, rather, a "probability or substantial chance of criminal activity" is all that is required. *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir.1993) (en banc) (internal quotation marks omitted). Police officers are able to make a stop if they have probable cause to believe that a traffic violation occurred, even if the stop was pretextual. *United States v. Sanford*, 476 F.3d 391, 394–95 (6th Cir.2007). Determining whether or not officers had probable cause requires a

fact dependent analysis of what the officer knew at the time of the stop. *Valdez*, 147 Fed.Appx. at 594. The fact that an officer had an ulterior motive to make the stop, such as to investigate illegal drug activity, is constitutionally irrelevant. *Id.; see also Whren v. United States*, 517 U.S. 806, 813–14, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Subjective intentions and actual motivations of officers in traffic stops "play no role" in determining the constitutional reasonableness of traffic stops in a probable-cause Fourth Amendment analysis. *Whren*, 517 U.S. at 813, 116 S.Ct. 1769. Therefore, the inquiry to be made by this court in determining if the traffic stop violates the Fourth Amendment is whether the officer "had an objectively verifiable reason" for pulling over Defendant's truck in light of the facts and circumstances known to the officer at the time of the stop. *Tullock*, 578 Fed.Appx. at 513; *United States v. Barnes*, 19 F.3d 19 (6th Cir.1994) (table).

■ In the present case, based on Trooper Wilson's testimony and a videotape of the events, the district court concluded that the stop was constitutional because Wilson had sufficient probable cause to believe that Defendant had 1) been following the car in front of him too closely, in violation of Tenn.Code Ann. § 55–8–124(a), and 2) failed to make a proper stop at a stop sign, in violation of Tenn.Code Ann. § 55–8–149(c). At the suppression hearing, Trooper Wilson testified:

> As I proceeded north down the exit ramp, Exit 60 off I–75, as we was [sic] approaching the intersection of Highway 68 I did observe the black GMC pick up truck traveling too close in an unsafe position behind a gray Honda passenger car. The closer they get [sic] to the intersection of Highway 68 at one time the black GMC pickup truck had to apply his brakes more suddenly nearly

tapping the gray Honda passenger car. Then once they proceeded to the intersection and the black GMC pickup truck, as he approached the stop sign, there is a stop line. He did proceed past that stop line and made a very brief rolling stop and then turned right on Highway 68 eastbound.

Hearing Tr. at 19–20, R.E. 55, Page ID # 282–83. I conclude Trooper Wilson had probable cause to stop Defendant for violating Tennessee Code Annotated § 55–8–124(a) by following the car in front of him too closely.

Trooper Wilson testified that Defendant was "following too closely" to the Honda passenger car in front of him, in violation of Tenn.Code Ann. § 55–8–124(a). The statute provides:

> (a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway.

As this court has previously noted: "Though the statute does not define 'reasonable and prudent,' the Tennessee drivers' manual provides that vehicles should maintain at least one car length for every ten miles per hour." *Sanford*, 476 F.3d at 395 (quoting *Valdez*, 147 Fed.Appx. at 594). In practice, cases in which Tennessee courts have found violations of the statute include the following: where "the vehicle was one and a half to two car lengths behind the truck and trailer, going 70 miles an hour," apparently for a distance of two miles, *State v. Harton*, 108 S.W.3d 253, 262 (Tenn.Crim.App.2002) (alteration marks omitted); where *the driver traveled eastbound on the interstate "at less than about a car length and was following [the car in front of him] for close to a mile," State v. Demcovitz*, 2012 WL 1388482, at *1 (Tenn.Crim.App. Apr. 20,

2012); and where the driver on I–65 "was following an RV at less than one car's length," *State v. Hudson,* 2005 WL 639129 at *3 (Tenn.Crim.App. Mar. 15, 2005).

Additionally, this court has upheld probable cause rulings for violations of the statute where the driver "was traveling between ... 55 miles per hour and 70 miles per hour" and left "about a car length to a car and a half at most behind the tractor trailer" in front of him, *United States v. Walton,* 258 Fed.Appx. 753, 754 (6th Cir.2007); where the driver was "following approximately one car-length behind a Saturn and also following too closely to a tractor-trailer at speeds approaching sixty miles per hour," *United States v. Bonilla,* 357 Fed.Appx. 693, 695–96 (6th Cir.2009) (addressing similar Ohio statute); where the driver, "drove at about 60 miles per hour for about 15 second at a distance of 20–30 feet behind the car in front of him," *Valdez,* 147 Fed. Appx. at 595; and where the driver "came to within ten feet of the slow and steadily moving truck and had to 'slam on his brakes' to avoid a rear-end collision," *Sanford,* 476 F.3d at 396.

Although the facts in the case at hand differ from those in each of the above cases in terms of speed and distance between cars, the cases provide clear guidance on how this court, as well as Tennessee courts, interpret the statute's "reasonable and prudent" standard. Each of these cases referenced the standard set forth in the Tennessee Comprehensive Driver License Manual, which states that vehicles must maintain at least one car length for every ten miles per hour. The district court in this case relied on the same standard:

> ... the defendant argues that, in pulling over the defendant for not having a car's length of space between the defendant's truck and the Honda, the trooper was holding the defendant, not to legal requirements under Tennessee law, but to safety standards taught as part of drivers' education classes. This argument, however, is unconvincing because "[t]hough the statute does not define 'reasonable and prudent,' the Tennessee drivers' manual provides that vehicles should maintain at least one car length for every ten miles per hour." *United States v. Walton,* 258 Fed.Appx. 753, 756–57 (6th Cir.2007) (citing *United States v. Sanford,* 476 F.3d 391 (6th Cir.2007)).

*United States v. Huff,* No. 3:10–CR–73, 2011 WL 1429627, at *7 (E.D.Tenn. Apr. 14, 2011).

However, it should be noted that the Manual has been updated and no longer includes the "one car length for every ten miles per hour" standard cited in these cases. The version of the Manual in effect in 2010 sets forth a "Two–Second Rule." *See, e.g., United States v. Collazo,* 37 F.Supp.3d 942, 946 (M.D.Tenn.2014) (applying the Two–Second Rule). This Rule is as follows:

A. As the car ahead of you passes a stationary point on the road (a sign post, driveway, utility pole, etc.), count the seconds it takes you to reach the same spot.

B. Count to yourself "one-thousand and one, one-thousand and two," etc. You should NOT reach the same point on the road before you finish counting to at least "one-thousand-two." If you do, you are following too closely.

C. Slow down slightly to increase the space between you and the other vehicle. Find another spot to check your new following distance. Repeat this exercise until you are following no closer than two seconds.

2010 Tenn. Comp. Driver License Manual. The Manual then states:

> However, during inclement weather, interstate highway driving at higher speeds and night driving, the two-second rule should be increased to allow for improved visibility. A minimum of four seconds should allow for better reaction time and a safer space cushion under these conditions including following a motorcycle.

*Id.* The Manual also states that the safe stopping distance for a lightweight passenger car travelling 30 miles per hour is 87 feet; and if the car is travelling 40 miles per hour, the safe distance is 140 feet.

Under either the older or newer standard, the Manual indicates Trooper Wilson had probable cause to stop Defendant for violating Tenn.Code Ann. § 55–8–124(a).

According to Trooper Wilson's testimony at the suppression hearing, Defendant, in his GMC truck, was following too closely to a Honda passenger car as they travelled on the exit ramp. Trooper Wilson testified that as the vehicles approached the intersection of Highway 68, the GMC truck had to "apply his brakes more suddenly nearly tapping the grey Honda." Hearing Tr. at 19–20, R.E. 55, Page ID # 282–83. Wilson testified that Defendant's truck was traveling at approximately 36 miles per hour, Hearing Tr. at 70:11–13, Page ID # 333, and the distance between Defendant's truck and the Honda on the exit ramp was "less than one car length." Hearing Tr. at 29:24, Page ID # 292.

The video of the traffic stop corroborates Trooper Wilson's testimony. At the start of the video, the GMC truck was one to two car lengths behind the Honda passenger car, which under the older standard is less than the required three and a half car length separation for vehicles traveling 36 miles per hour. As the vehicles ap-

proach the stop sign at the intersection of Highway 68, the truck closes the distance from the Honda for approximately three seconds before the driver of the Honda applies his brakes. *See* Gov't Suppression Ex. 3 at 7:08.53–7:08.56. As the distance between the two vehicles closes, the driver of the truck applies his brakes for a solid five seconds before he is able to release the brakes and ease forward toward the stop sign. However, because of the angle of the camera, the video does not show the near accident between the Honda and Defendant's truck.

Using one of the light poles shown in the video as a reference point, Defendant's truck was travelling at a count of approximately one second behind the Honda. While Trooper Wilson did not testify as to the road conditions that day, the video shows Trooper Wilson was using his windshield wipers, and light rain can be seen on the windshield. The video also reveals that it is still early morning and Trooper Wilson and the other vehicles in the video are using their headlights. Arguably, the Manual's Four–Second Rule for inclement weather or night driving would apply.

The district court, upon viewing the video and hearing Trooper Wilson's testimony, found that Trooper Wilson had sufficient probable cause to stop Defendant's truck for violating Tennessee Code Annotated § 55–8–124(a). This court reviews the credibility determinations and factual findings of the district court for clear error. *United States v. Jimenez*, 446 Fed. Appx. 771, 774 (6th Cir.2011); *see also Sanford*, 476 F.3d at 396; *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Based on this evidence, Trooper Wilson had an objectively verifiable reason for stopping Defendant's truck. Accordingly, the district court properly concluded that Trooper Wilson had probable cause to ini-

tiate a traffic stop of Defendant's truck for a violation of Tennessee Code Annotated § 55–8–124(a). I would affirm the district court's denial of Defendant Wesley Huff's motion to suppress on this basis. Therefore, I do not join Parts II.A. or II.B. to the extent that they are inconsistent with or unnecessary to upholding the denial of the motion to suppress on the basis of a lawful stop of Defendant's vehicle for a violation of Tennessee Code Annotated § 55–8–124(a).