NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0670n.06

No. 12-6425

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 27, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| RODNEY TULLOCK, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE: DAUGHTREY, CLAY and STRANCH, Circuit Judges.

**STRANCH, Circuit Judge.** Rodney Tullock appeals his conviction on drug charges and his sentence of 61 months in prison following a jury trial held in May 2012. He challenges the district court's denial of his motion to suppress evidence relating to a traffic stop and the quantity of oxycodone pills attributed to him at sentencing. We REVERSE Tullock's convictions because the motion to suppress evidence should have been granted. Accordingly, we REMAND for further proceedings consistent with this opinion. We address the sentencing issue to provide guidance to the district court and the parties in the event Tullock is retried and again convicted.

## I. PROCEDURAL HISTORY

In September 2011, a grand jury returned a forty-five count indictment against twenty-one defendants, including Tullock and the leader of the drug conspiracy, William H. McMahan, Jr. Tullock was named in only two counts of the indictment: Count 3, charging that, between

January 2009 and September 13, 2011, he conspired with McMahan and other co-conspirators to distribute and to possess with intent to distribute a quantity of oxycodone, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(C) & 846; and Count 21, charging that, on April 21, 2010, he knowingly and intentionally possessed with intent to distribute a quantity of oxycodone, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C).

At trial, the government connected Tullock to the conspiracy primarily through intercepted telephone conversations between Tullock and McMahan that were obtained through a Title III wiretap on McMahan's cell phone and through Tullock's own statements made during a police interview. Drug agents conducted ongoing surveillance of McMahan's and Tullock's activities in an effort to corroborate the meetings McMahan and Tullock discussed on the phone. On April 21, 2010, as Tullock left McMahan's residence, a drug agent contacted Tennessee Highway Patrol Trooper Jacob Stielow and asked him to be on the lookout for a maroon van and to stop the van if there was probable cause to do so. Trooper Stielow later spotted the van and stopped Tullock for following too closely to the car in front of him. Trooper Stielow searched the van with Tullock's permission and found oxycodone pills in vials bearing Tullock's name on the prescription labels. No witnesses testified that they bought oxycodone pills from Tullock or saw him sell drugs to customers. Tullock admitted during a law enforcement interview, however, that he unlawfully distributed oxycodone pills. He did not testify at trial or present any witnesses. After hearing the government's evidence, the jury convicted Tullock on both counts.

At sentencing, the district court held Tullock responsible for 4,050 30-milligram oxycodone pills, which is equivalent to 814 kilograms of marijuana. This drug quantity produced a base offense level of 30 under USSG § 2D1.1(c)(5). With no other sentencing enhancements or reductions, the total offense level of 30, combined with a criminal history

category of I, produced an advisory guideline range of 97 to 121 months imprisonment. The district court overruled Tullock's objections to the Presentence Report, including his challenge to the drug quantity, but the court granted his motion for a downward variance and imposed a sentence of 61 months of imprisonment. We have jurisdiction of this appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II. ANALYSIS

Tullock's motion to suppress evidence of the traffic stop should have been granted because Trooper Stielow lacked probable cause to stop Tullock's van. As a result, we reverse Tullock's convictions.

### A. Motion to Suppress Evidence

*1. Standard of review*

In reviewing the denial of a motion to suppress evidence, we examine the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012). "A factual finding is clearly erroneous when a court, on reviewing the evidence, 'is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009). Whether a seizure was reasonable under the Fourth Amendment is a question of law. *Id.* Because the district court denied Tullock's motion to suppress, we review the evidence in a light most favorable to the government. *Id.*

2. *The traffic stop was not based on probable cause*

At the suppression hearing, the government called Trooper Stielow to testify briefly about the traffic stop. Tullock did not take the stand or call any witnesses.

Trooper Stielow testified that, on April 21, 2010, he was working in Greene County when he received a telephone call from TBI Special Agent Wilhoit expressing interest in a maroon Chevy van. Agent Wilhoit asked Trooper Stielow to stop the van if he had probable cause to do so and to report anything unusual discovered during the stop. Agent Wilhoit and other investigators knew that Tullock had just left McMahan's residence and they suspected he was carrying a quantity of oxycodone pills that he purchased from McMahan.

Sometime later, while running radar on Highway 321 between Greeneville and Newport, Trooper Stielow spotted a maroon Chevy van. His first thought was, "[W]ow, that van is really close to the vehicle in front of it," so he stopped the van for following too closely, a violation of state law.[1]

Trooper Stielow considered a number of factors before making the stop, including the speed of the vehicles and the condition and grade of the roadway, but his main consideration was whether the van driver could stop without causing a rear-end collision if the vehicle in front of him had to stop for any reason. The weather conditions were not adverse at the time. Trooper Stielow did not recall how fast the van was moving even though he was running radar at the time. He did not think the driver was speeding or he would have written a speeding ticket. He

---

[1]Tennessee Code Annotated § 55-8-124(a) provides:

The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway.

could not specify the distance between the two vehicles and he did not think the vehicle in front of the van was slowing down to make a turn.

Trooper Stielow approached the driver and requested identification. Tullock nervously produced his commercial driver's license (CDL). When asked about his visible nervousness, Tullock replied, "I don't really like being stopped."

Trooper Stielow asked Tullock if he was taking any prescription medications, thinking that might explain Tullock's nervous shaking. Tullock responded that he was. Trooper Stielow asked, "Well, do you have any on you?" to which Tullock answered, "Yes, there's some in the vehicle." When Trooper Stielow asked for permission to search the van, Tullock replied, "Go ahead, go right ahead." Trooper Stielow and a backup officer who had arrived on the scene searched the van.

Trooper Stielow was not asked during the suppression hearing what he found during the search of Tullock's van. At trial, however, he testified that the search of the front passenger compartment turned up several empty pill vials bearing oxycodone prescription labels in Tullock's name. Trooper Stielow also found a chip cannister behind the rear passenger seat that held more pill vials for oxycodone prescriptions written in Tullock's name. Some of these vials contained a total of 170 oxycodone pills. The vial labels indicated that the prescriptions had been obtained in Florida within the previous month.

Trooper Stielow did not seize the oxycodone pills because the name on the labels matched Tullock's identification and there was nothing obviously illegal about his possession of the pills. There were no drug packaging materials or large amounts of cash in the van. Trooper Stielow handed Tullock a warning citation for following too closely and allowed him to leave the scene.

The traffic stop was constitutionally reasonable if Trooper Stielow had probable cause to believe that Tullock violated § 55-8-124(a). *See Whren v. United States*, 517 U.S. 806, 819 (1996). In this circuit, "to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *Lyons*, 687 F.3d at 763; *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004). We employ the probable cause standard because the parties agree that their dispute centers on whether Trooper Stielow could stop Tullock for a civil violation of § 55-8-124(a).

Our inquiry focuses on whether Trooper Stielow had an objectively verifiable reason for stopping Tullock's van. *See United States v. Hughes*, 606 F.3d 311, 315–16 (6th Cir. 2010); *United States v. Herbin*, 343 F.3d 807, 809 (6th Cir. 2003). Trooper Stielow's subjective intent in conducting the traffic stop is not a relevant factor in the Fourth Amendment analysis. *See Whren*, 517 U.S. at 813.

Trooper Stielow recalled few objective facts to justify the traffic stop. He remembered only that the weather was clear, Tullock probably was not speeding, and Tullock did not have to slam on his brakes to avoid hitting the car in front of him. He could not recall the speed the vehicles were traveling, the amount of distance between them, or for how long a period Tullock drove too closely to the car in front of him.

In *United States v. Sanford*, 476 F.3d 391, 393 (6th Cir. 2007), by contrast, this court concluded that a deputy sheriff provided sufficient objective facts to justify his decision to make a traffic stop for following too closely under § 55–8–124(a). The deputy watched a car traveling at 65 miles per hour on the interstate approach a slow-moving tractor-trailer truck. *Id.* The car's driver was unable to change lanes quickly. He slammed on the brakes and came within ten feet of the truck in front of him. *Id.* This court held that the deputy had probable cause to stop the

driver for violating § 55–8–124(a) because he did not maintain a distance of at least one car length for every ten miles per hour of speed as directed in the Tennessee drivers' manual. *Id.* at 393, 395. Trooper Stielow did not testify to any similar facts.

Other examples of proper traffic stops for following too closely appear in our unpublished cases, although those decisions are not binding on us here. In *United States v. Kelley*, 459 F. App'x 527, 532 (6th Cir. 2012), the officer stopped a driver who was following a vehicle in front of him within three to five feet at about 55 miles per hour; the intervening distance should have been fifty feet. These objective facts were sufficient to show a violation of § 55–8–124(a) to support probable cause for a traffic stop. *Id.*

In *United States v. Jimenez*, 446 F. App'x 771, 772 (6th Cir. 2011), an officer watched as a car traveling 55 miles per hour on an interstate pulled within twenty-four inches of the rear bumper of a tractor-trailer truck. This conduct, along with the driver's other maneuvers, formed probable cause to stop the driver for following too closely. *Id.* at 773–74.

In *United States v. Walton*, 258 F. App'x 753, 754, 756–57 (6th Cir. 2007), the court relied on *Sanford* to hold that probable cause existed for an officer to stop a car for following too closely under § 55–8–124(a) where the car's driver, upon spotting a police vehicle parked in the median, immediately changed lanes and pulled within less than two car lengths behind a tractor-trailer truck. In *United States v. Valdez*, 147 F. App'x 591, 592–95 (6th Cir. 2005), probable cause existed to make a traffic stop for violation of § 55–8–124(a) where a car driving 60 miles per hour on an interstate pulled within twenty feet of a vehicle and followed closely for fifteen seconds.

In all of these cases law enforcement officers specified the objective facts that led them to form probable cause to make the traffic stops. By stark contrast, Trooper Stielow did not.

Although we give due deference to the district court's determination that Trooper Stielow was a credible witness, *see United States v. Akram*, 165 F.3d 452, 456 (6th Cir. 1999), the substance of the testimony he provided was simply insufficient to demonstrate probable cause to stop Tullock's van. The district court's contrary determination is erroneous, and the motion to suppress evidence should have been granted. Accordingly, we reverse Tullock's convictions and remand for further proceedings.

## B. Drug quantity determination

We address the sentencing issue only to provide guidance to the district court and the parties in the event the government elects to retry Tullock and he is again convicted.

At the original sentencing, the district court held Tullock responsible for 4,050 oxycodone pills. This quantity included 3,600 pills Tullock obtained legally at Florida pain clinics under prescriptions written in his own name, as well as 450 pills he obtained illegally from McMahan as part of the charged conspiracy. Citing *United States v. Page*, 232 F.3d 536 (6th Cir. 2000), the district court ruled that the drugs Tullock obtained from his supplier for his personal use could be counted in determining the drug quantity for purposes of sentencing. The court found that Tullock's statement about traveling to Florida monthly to obtain oxycodone tablets was sufficient to meet the burden.

USSG § 1B1.3 provides that relevant conduct is determined on the basis of "all acts . . . committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts . . . of others in furtherance of the jointly undertaken criminal activity." Tullock does not dispute that the oxycodone pills he

purchased from McMahan constitute relevant conduct because those purchases occurred during the jointly undertaken criminal activity of the charged conspiracy. Under *Page*, the court may count as relevant conduct all of the pills Tullock purchased from McMahan, even if some of them were purchased for Tullock's own personal use. *See Page*, 232 F.3d at 542.

*Page* does not apply to the 3,600 oxycodone pills Tullock obtained on his own in Florida through legal prescriptions. The government did not present any proof that Tullock obtained those pills as part of the charged conspiracy or that McMahan had any involvement in those purchases. Thus, *Page* cannot support the district court's decision to hold Tullock accountable for those pills when McMahan did not supply them.

The district court should have determined how many of the 3,600 oxycodone pills Tullock obtained in Florida were attributable to his own lawful personal use and how many were unlawfully distributed or possessed with intent to distribute to others. Relevant conduct includes only unlawful activity. USSG § 1B1.3. "[P]resuming that the full quantity possessed by conspiracy members is 'contraband . . . within the scope of the criminal activity,' without requiring the government to prove and without a factual finding by the district court explicating the evidence supporting that finding, creates an unacceptably high risk that a defendant will be punished for drug quantities a portion of which was lawfully obtained, possessed, and consumed." *United States v. Bell*, 667 F.3d 431, 443 (4th Cir. 2011).

Ordinarily, the government bears the burden to prove the drug quantity attributable to the defendant by a preponderance of the evidence, but "the defendant bears the burden of production with respect to his personal use of the drug in question." *United States v. Gill*, 348 F.3d 147, 153, 156 (6th Cir. 2003) (relying on *United States v. Asch*, 207 F.3d 1238, 1246 (10th Cir. 2000)). The *Gill* court adopted the suggestion in *United States v. Wyss*, 147 F.3d 631, 633 (7th

Cir. 1998), that "when the defendant buys drugs both for his own consumption and for resale, he has some burden of producing evidence concerning the amount that he consumed—he cannot just say to the government, 'I'm an addict, so prove how [many of the pills] that I bought I kept for my own use rather than to resell.'"

If the government opts to retry Tullock and he is again convicted, Tullock must carry a burden of production to show how many of the oxycodone pills that he obtained in Florida were for his own lawful use. The government must carry the burden of persuasion to prove the number of oxycodone pills Tullock unlawfully distributed or possessed with intent to distribute. The district court's findings must be based on the evidence presented. If the amount of drugs attributable to the defendant is uncertain, "the district court must 'err on the side of caution' and hold the defendant accountable only for that amount that is more likely than not attributable to the defendant." *See Gill*, 348 F.3d at 151.

## III. CONCLUSION

Tullock's motion to suppress evidence should have been granted because Trooper Stielow did not establish probable cause to make a traffic stop for a violation of § 55–8–124(a). For this reason, we REVERSE Tullock's convictions and REMAND for further proceedings consistent with this opinion.