RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0075p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 15-5806

JUAN COLLAZO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:13-cr-00209—Todd J. Campbell, Chief District Judge.

Argued: March 8, 2016

Decided and Filed: March 29, 2016

Before: CLAY, GILMAN, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David I. Komisar, Nashville, Tennessee, for Appellant. Van S. Vincent, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** David I. Komisar, Nashville, Tennessee, for Appellant. Van S. Vincent, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. This case involves a traffic stop on Interstate 40 that morphed into a warrantless search of the vehicle, which in turn uncovered a cache of cocaine. The vehicle in question was being driven by Juan Collazo, with his wife Cinthia as a passenger. At issue is the validity of both the traffic stop and the subsequent search.

Collazo was indicted on one count of conspiracy to possess five kilograms or more of cocaine with the intent to distribute the drug. The United States District Court for the Middle District of Tennessee denied Collazo's motion to suppress the evidence seized by the police. This caused Collazo to enter into a conditional plea of guilty that preserved his right to appeal the district court's denial of his motion to suppress.

Collazo now appeals, arguing that the evidence obtained from his van should have been suppressed because (1) there was no probable cause for the traffic stop, (2) the traffic stop was unconstitutionally prolonged, and (3) the search of the van violated his Fourth Amendment rights. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.    Factual background

The traffic stop was largely recorded on the dashboard camera of the officer making the stop, but the audio function on the camera was broken. Recording began approximately 30 seconds prior to the initiation of the patrol car's lights. The video ends approximately 70 minutes after the initiation of the traffic stop because the camera ran out of memory.

#### 1.    *Hill's decision to conduct a traffic stop of Collazo's van*

On October 9, 2013, West Tennessee Drug Task Force Special Agents Preston Hill and David Montgomery were patrolling Interstate 40 in Haywood County, Tennessee in separate cars. Collazo was driving his van on that same stretch of Interstate 40 with his wife Cinthia accompanying him in the front passenger seat. Hill decided to conduct a traffic stop after concluding that Collazo's van was following too closely behind the tractor-trailer ahead of it.

Although Hill did not know the exact speed of the van because the speed function on his camera was not working, he estimated that the van was travelling close to the interstate speed limit of 70 miles per hour. Collazo disputes this estimate and contends that he was travelling at only 55 miles per hour. Referencing the recording, Hill testified that Collazo's van was less than four car lengths behind the tractor-trailer shortly before he decided to pull the van over. Hill did not know the exact distance between the two vehicles, but he "eyeballed" the gap in question.

He further testified that the van started to decrease speed roughly 20 seconds before he activated his lights, but it was still traveling at an unsafe distance behind the tractor-trailer. At that time, there were four broken white lines visible on the interstate between the tractor-trailer and Collazo's van. Hill admitted that he did not know how much distance the broken white lines represented, but he testified that, according to the video, the van was travelling with only a three-second following distance just before he activated his lights.

According to Hill, a vehicle is following too closely if the distance between the two vehicles in question is less than one car length for every ten miles per hour of velocity. In other words, if a car were travelling 70 miles per hour, that vehicle would be violating the law if there were less than seven car lengths between it and the car in front. Hill testified that he would not have stopped Collazo if the van had been travelling seven or more car lengths behind the tractor-trailer.

### 2.      *The traffic stop*

After Collazo pulled over onto the shoulder, Hill approached the passenger side of the van and asked Collazo for his license, registration, and proof of insurance. While standing on the passenger side of the van, Hill observed a jar of what appeared to be urine between the driver and passenger seats. Hill testified that this represented "hard travel . . . where you don't want to stop," which is not common for passenger vehicles. He also witnessed Cinthia behaving erratically—moving a lot and being "very animated in her speaking."

Approximately two minutes later, Hill asked Collazo to exit the van and stand next to Hill's patrol car because he was having trouble hearing Collazo due to traffic noise. After Collazo complied, Hill explained to Collazo that he was being stopped for following too closely. Hill told Collazo that he was going to check Collazo's license and retrieve a citation book. He also asked Collazo a follow-up question about his address.

Roughly four minutes after the stop began, while Hill was working on the warning citation, he asked Collazo about his travel destination. Collazo replied that he was travelling from Dallas to a hospital in Nashville to visit his father-in-law, who had just had a stroke, but

that he did not know which hospital. Hill and Collazo then engaged in a general conversation about Collazo's van for a couple minutes.

Approximately six minutes into the stop, Hill asked for permission to speak with Cinthia. According to Hill, Collazo granted his permission, although Collazo disputes this. Hill then returned to the passenger side of the van and asked Cinthia about her father's health condition. She told him that they were travelling to Nashville to visit her father, who had just had a stroke, but she did not know where he lived. Cinthia said that she was going to call her sister to find out where in Nashville he lived because she thought he had moved since she last saw him. Hill then asked if she had ever been arrested for narcotics. She replied that she had.

After speaking with Cinthia for about five minutes, Hill returned to the patrol car and explained to Collazo that dispatch had not yet called back with the check on his license. When asked, Collazo said that he was okay with waiting until dispatch called back. Hill then asked Collazo about his wife's behavior, specifically whether she was under the influence of narcotics. Collazo said that his wife might be on pain medication as a result of several recent surgeries.

Approximately 13 minutes into the stop, Hill called Agent Montgomery for assistance. Montgomery arrived roughly two minutes later and spoke briefly with Collazo. About 16 minutes after the stop began, Montgomery walked to the passenger side of the van to talk to Cinthia. Hill contemporaneously started explaining the warning citation to Collazo. A couple of minutes later, after the license check was complete, Collazo signed the warning citation, and Hill continued to explain the citation to him. Approximately 21 minutes after he pulled Collazo over, Hill shook Collazo's hand to conclude the traffic stop for following too closely. Collazo was "free to go" at that point as far as Hill was concerned. Hill and Collazo both remained by the patrol car chatting for another eight minutes, however, until Montgomery returned to the patrol car with Cinthia's purse.

### 3. *Montgomery's conversation with Collazo's wife*

When Montgomery first approached the van, Cinthia appeared very animated, like she was under the influence of an intoxicant. Montgomery asked her if he could speak with her, and she did not object. He could tell that she was more nervous than normal and asked her general

questions about her travel plans.  Cinthia said that she was travelling to Nashville to visit her father at his home because he had had a stroke.  She did not know where the home was, but she was going to call her sister for directions.  Montgomery thought that the fact that she did not know the address was "extremely odd."  Moreover, he concluded that her answers and body language indicated deception.  In particular, Montgomery noted Cinthia's "pronounced carotid pulse," "very rapid belly breathing," inability to keep her hands steady, and refusal to make eye contact.

Montgomery asked Cinthia if she was nervous because something illegal was in the van.  She initially hesitated, so he repeated the question and asked, "if it is illegal, is it a little bit, or is it a lot?"  Cinthia said that it was a lot and handed her purse to Montgomery.  He asked if something illegal was in the purse, and she nodded her head "yes."  After Montgomery asked, Cinthia consented to a search of her purse.  When he looked in the purse, Montgomery discovered a prescription bottle for Suboxone and several loose Suboxone strips.  Cinthia informed Montgomery that she had paid a relative $10 for each strip.  Montgomery discovered the Suboxone three to five minutes into his conversation with Cinthia.  He could not remember her telling him that she had a prescription for Suboxone.  Cinthia started crying, and Montgomery spent the next several minutes trying to calm her down.

### 4. *Montgomery's return to Hill's patrol car and the search of the van*

Montgomery returned to Hill's patrol car carrying Cinthia's purse approximately 28 minutes after the traffic stop commenced, at which point he asked Collazo about the Suboxone strips in her purse.  Collazo said that he thought that Cinthia had a prescription because of several past surgeries.  Cinthia's prescription was for 15 strips of Suboxone.  The directions on the prescription bottle, which had Cinthia's name on it and was dated August 30, 2013, said to take half a strip every day.  If the directions were followed, that would be a 30-day supply.  Cinthia's purse contained 14 Suboxone strips.  While questioning Collazo, Montgomery told him that Cinthia had too many Suboxone strips based on the information on the bottle.  Montgomery later testified that having almost the whole prescribed amount over a month after the prescription was filled was strange.

Hill testified that, a few minutes after Montgomery returned to the patrol car, Hill walked back to the van and asked for and received Cinthia's consent to search the van for additional narcotics. Shortly thereafter, Montgomery placed handcuffs on Collazo, and Hill walked back to his patrol car. Hill then asked Collazo for consent to search the van, and he allegedly agreed. Collazo denies giving such consent. Hill did not ask for or obtain written consent to search from either Collazo or Cinthia, which was in violation of the West Tennessee Drug Task Force's policy. The officers subsequently began a search of the van, where they discovered three kilograms of cocaine approximately 90 minutes after the stop began. A later search of the van following an attempted controlled delivery of the cocaine to its intended recipient turned up 14 more kilograms of cocaine.

**B.      Procedural background**

Later in October 2013, Collazo was indicted on one count of conspiracy to possess five kilograms or more of cocaine with the intent to distribute the drug, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2. In February 2014, Collazo filed a motion to suppress the evidence recovered from his van as result of the search. The district court denied his motion following a suppression hearing. In May 2015, Collazo entered a conditional plea of guilty to the conspiracy count, reserving his right to appeal the denial of his motion to suppress. Collazo was subsequently sentenced to 120 months of imprisonment. This timely appeal followed.

## II.  ANALYSIS

**A.      Standard of review**

When a defendant appeals the denial of a motion to suppress evidence, we "review the district court's findings of fact under the clear-error standard and its conclusions of law de novo." *United States v. Quinney*, 583 F.3d 891, 893 (6th Cir. 2009). We also consider "the evidence in the light most likely to support the district court's decision." *United States v. Pritchett*, 749 F.3d 417, 435 (6th Cir. 2014) (citation omitted). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (citation and internal quotation

marks omitted). Factual findings are not clearly erroneous "where there are two permissible views of the evidence." *Id.* (brackets and citation omitted).

**B.** **The traffic stop and the officers' subsequent search of the van did not violate Collazo's Fourth Amendment rights**

**1.** ***Hill had probable cause to stop Collazo's van for following too closely***

"An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). The subjective intent of the officer making the stop is irrelevant in determining whether the stop violated the defendant's Fourth Amendment rights. *Whren v. United States*, 517 U.S. 806, 813 (1996) (concluding that, for purposes of the Fourth Amendment, "the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved"); *see also Blair*, 524 F.3d at 748 (noting that "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop" (brackets and citation omitted)).

This circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Blair*, 524 F.3d at 748. Caselaw in this circuit also "has asserted, albeit in dicta, that reasonable suspicion of a completed misdemeanor is not sufficient to justify an investigatory stop." *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (citing *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)).

In the present case, Hill stopped Collazo's van for following too closely behind the tractor-trailer in front of him. Tennessee law provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Tenn. Code Ann. § 55-8-124(a). A violation of § 55-8-124(a) is a misdemeanor. *Id.* § 55-8-124(e); *see also Sanford*, 476 F.3d at 395.

Because the record is less than clear as to whether Collazo had sufficiently widened the gap immediately before Hill initiated the traffic stop, one could question whether Collazo was engaged in an *ongoing* misdemeanor. We will accordingly apply the stricter probable-cause standard. *See United States v. Hughes*, 606 F.3d 311, 316 n.8 (6th Cir. 2010) (applying the probable-cause standard to a completed misdemeanor). Although we have no need to resolve the issue in the case before us, we note that the dividing line between when probable cause is required for a traffic stop and when reasonable suspicion is sufficient is in need of greater clarity in this circuit. *See id.* ("'There is a degree of confusion in this circuit over the legal standard governing traffic stops,' and in particular over whether police officers must have reasonable suspicion or probable cause in order to make a valid stop." (quoting *Sanford*, 476 F.3d at 394)).

Based on the above analysis, the stop of Collazo's van comported with the Fourth Amendment if Hill had probable cause to believe that the van was following too closely behind the tractor-trailer in front of it. "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Blair*, 524 F.3d at 748. It "does not require an actual finding of a violation, rather, a probability or substantial chance of criminal activity is all that is required." *United States v. Huff*, No. 12-5581, 2015 WL 6743477, at *23 (6th Cir. Nov. 4, 2015) (citation and internal quotation marks omitted); *see also Sanford*, 476 F.3d at 396 n.2 ("The relevant inquiry is whether the police officer possessed probable cause . . . to believe that a traffic violation occurred, not whether a traffic violation in fact occurred.").

A canvass of the caselaw interpreting Tenn. Code Ann. § 55-8-124(a) uncovers no opinion that dictates the outcome of the present case. One line of cases holds that a following distance of less than two car lengths supplies probable cause to stop a vehicle traveling at interstate speeds for violating § 55-8-124(a). *See, e.g.*, *United States v. Walton*, 258 F. App'x 753, 754, 756–57 (6th Cir. 2007) (affirming the denial of a motion to suppress where the following distance was "about a car length to a car and a half"); *State v. Harton*, 108 S.W.3d 253, 258–60 (Tenn. Crim. App. 2002) (same, but with a following distance of "one and one-half to two car lengths"). A second line of cases holds that where the record does not include any information regarding the speed and following distance of the vehicle allegedly violating § 55-8-124(a), probable cause does not exist to stop the vehicle for following too closely. *See*

*United States v. Tullock*, 578 F. App'x 510, 513–14 (6th Cir. 2014) (concluding that there was no probable cause in the absence of any testimony establishing either the speed of the vehicles or the distance between them); *State v. Baldwin*, No. W2011-02383-CCA-R3-CD, 2012 WL 1656285, at *3 (Tenn. Crim. App. May 10, 2012) (finding no reasonable suspicion—and thus necessarily no probable cause—where "there was no proof establishing the distance between the vehicles or the speed that they were travelling"); *State v. McCraney*, No. W2003-00011-CCA-R9-CD, 2003 WL 21998487, at *3–4 (Tenn. Crim. App. Aug. 22, 2003) (same). Although the above cases stake out the boundaries of the issue before us, they do not resolve the present case because Hill testified that Collazo's van was travelling approximately 70 miles per hour while maintaining a following distance of less than four car lengths behind the tractor-trailer.

We are not aware of any criminal cases from the Tennessee courts delineating a standard for what constitutes a "reasonable and prudent" following distance under Tenn. Code Ann. § 55-8-124(a). *See, e.g.*, *State v. Demcovitz*, No. W2010-02459-CCA-R3-CD, 2012 WL 1388482, at *6–7 (Tenn. Crim. App. Apr. 20, 2012) (holding that § 55-8-124(a) is not unconstitutionally vague or overbroad in the course of affirming the denial of a motion to suppress, but failing to detail a standard for what constitutes "reasonable and prudent"); *Harton*, 108 S.W.3d at 258–60 (same). In reaching the conclusion that § 55-8-124(a) applies only when the vehicle being followed was in the same lane as the car that was allegedly following too closely, one Tennessee civil case noted that "the reasonableness of the distance maintained by the operator of the following vehicle has been measured in terms of the operator's ability to make an emergency stop without striking the forward vehicle." *Helms v. Weaver*, 770 S.W.2d 552, 553 (Tenn. Ct. App. 1989). This still begs the question of how much distance is required to make an emergency stop.

Confronted with this interpretative vacuum, this court has consistently turned to the Tennessee Comprehensive Driver's License Manual (the Manual) for guidance in applying the "reasonable and prudent" standard. *See, e.g.*, *Huff*, 2015 WL 6743477, at *24 (looking to the Manual for guidance on the meaning of "reasonable and prudent" under § 55-8-124(a)); *Sanford*, 476 F.3d at 395 (same). The pre-2010 version of the Manual provided that vehicles should "maintain at least one car length for every ten miles per hour" of velocity. *Huff*, 2015 WL

6743477, at \*24. Since 2010, the Manual has contained an alternate rule providing that "during . . . interstate highway driving at higher speeds," vehicles should maintain a minimum following distance of four seconds. *Id.* at \*25. To implement this rule, the Manual explains that "[a]s the car ahead of you passes a stationary point on the road (a sign post, driveway, utility pole, etc.), count the seconds it takes you to reach the same spot." *Id.* "You should NOT reach the same point on the road before you finish counting to at least 'one-thousand-[four].' If you do, you are following too closely." *Id.*

This court's persistent invocation of the Manual for guidance does not mean that a driver travelling at highway speeds necessarily violates Tenn. Code Ann. § 55-8-124(a) by breaking the car-length rule or the four-second rule. Drivers, after all, are statutorily bound to comply with the language of § 55-8-124(a), not with the language of the Manual. And the question whether probable cause existed to believe that there was a violation of the statute is different from whether a violation in fact occurred. *See Sanford*, 476 F.3d at 396 n.2. Accordingly, although neither of these rules constitutes an authoritative determination of what a "reasonable and prudent" following distance is, the rules operate as valuable guideposts when determining whether an officer possessed probable cause to stop a vehicle for violating § 55-8-124(a)—at least until Tennessee's legislature or its courts shed greater light on this question.

The record supports a finding that Collazo violated both the car-length rule and the four-second rule before Hill pulled him over. Hill testified that he was taught that a vehicle is following too closely if the distance between the two cars is less than one car length for every ten miles per hour of velocity. Although Hill did not know Collazo's exact speed, he estimated that the van was travelling close to 70 miles per hour. Collazo's following distance therefore should have been at least six to seven car lengths based on the car-length rule.

Hill testified that Collazo's van was less than four car lengths behind the tractor-trailer approximately 30 seconds before he initiated the traffic stop. Based on a review of the video of the traffic stop, we do not believe that the district court's factual finding that "[t]he video supports . . . Hill's testimony" is clearly erroneous. Collazo thus violated the car-length rule. And even if we credited Collazo's testimony that he was travelling at only 55 miles per hour— which we decline to do given the standard of review—he was still breaking the car-length rule

because he was following at a distance closer than five and a half car lengths. The record, viewed in the light most favorable to the district court's decision, therefore supports the conclusion that Hill had probable cause to conduct a traffic stop for a violation of Tenn. Code Ann. § 55-8-124(a).

Although Hill did not reference the four-second rule in his testimony, Collazo's nonconformity with the rule further supports the conclusion that the vehicle gap that Hill observed provided probable cause for him to stop the van for following too closely. Hill testified that, based on the video, Collazo's van was following the tractor-trailer with a three-second following distance before he activated his lights. Collazo therefore broke the four-second rule as well. Both of these transgressions point in the same direction: Hill had probable cause to stop Collazo for a violation of Tenn. Code Ann. § 55-8-124(a).

Collazo attempts to discredit Hill's assessment of the van's following distance by asserting that the van was 160 feet behind the tractor-trailer. He arrives at this conclusion by pointing out that the video displayed four broken white lines on the highway between his van and the tractor-trailer around the time that Hill allegedly observed Collazo following too closely. Collazo introduced evidence during the suppression hearing that the Federal Highway Administration's (FHA) Manual on Uniform Traffic Control Devices states: "Broken lines should consist of ten-foot line segments and 30-foot gaps, or dimensions in a similar ratio of line segments to gaps as appropriate for traffic speeds and need for delineation." Based on this information, Collazo infers that the van and the tractor-trailer were 160 feet apart. Collazo's van was 16 feet 10.5 inches long. Accordingly, if Collazo's 160-feet calculation is credited, the van was over nine car lengths behind the tractor-trailer. Collazo argues that this undercuts the conclusion that he was breaking the car-length rule.

Collazo's argument based on the FHA guidance fails, however, for three reasons. First, there is no evidence in the record confirming that the broken lines on the relevant stretch of Interstate 40 were painted in conformity with the FHA's guidance. Second, even if parts of Agent Montgomery's testimony are arguably ambiguous on this point, the lines are permitted to be painted in "dimensions in a similar ratio" of 1 to 3. The broken white lines could therefore be 5 feet long with gaps of 15 feet and still comply with the FHA's guidance. Finally, even if a

factfinder could permissibly infer from the record that the lines were 10 feet long with 30-foot gaps, we do not write on a blank slate. We must instead view all facts in the light most favorable to upholding the district court's decision. *United States v. Pritchett*, 749 F.3d 417, 435 (6th Cir. 2014). Accordingly, we do not credit the argument that the van was over nine car lengths behind the tractor-trailer.

### 2.      *The officers did not unconstitutionally prolong the traffic stop*

In *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), the Supreme Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates" a defendant's Fourth Amendment rights. *Id.* at 1612. "A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* (brackets, citation, and internal quotation marks omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed" unless "reasonable suspicion of criminal activity justified detaining [the defendant] beyond completion of the traffic infraction investigation." *Id.* at 1614, 1616–17; *see also United States* v. *Blair*, 524 F.3d 740, 752 (6th Cir. 2008) ("Once the purpose of a traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." (citation and internal quotation marks omitted)).

"Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (citation, ellipsis, and internal quotation marks omitted). For an officer's suspicion to be reasonable, he "must point to specific and articulable facts supporting his suspicion." *United States v. Perez*, 477 F. App'x 337, 341 (6th Cir. 2012) (citation and internal quotation marks omitted). This standard is less demanding than the probable-cause standard. *See Shank*, 543 F.3d at 313 (concluding that "reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause" (citation and internal quotation marks omitted)). A determination regarding the existence of reasonable suspicion is based on the "totality of the circumstances," and a reviewing

court "view[s] the evidence offered in support of reasonable suspicion using a common sense approach, as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004).

### a. Under the circumstances, 21 minutes was not an unreasonable amount of time for Hill to complete the traffic stop

The evidence in the present case, when viewed in the light most favorable to the district court's decision, does not support the argument that 21 minutes was an unreasonable amount of time to complete the traffic stop and issue a warning for following too closely. Most of the questions that Hill asked Collazo before he first spoke with Cinthia were inquiries related to the traffic stop, and none of them extended the traffic stop beyond a reasonable time. *See Rodriguez*, 135 S. Ct. at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (brackets, citation, and internal quotation marks omitted)); *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) ("Questions relating to travel plans, the driver's authority to operate the vehicle, or the safety of the officer are the sorts of classic context-framing questions directed at the driver's conduct at the time of the stop that rarely offend our Fourth Amendment jurisprudence." (brackets, citation, and internal quotation marks omitted)).

Similarly, the questions that Hill asked Cinthia regarding the health of her father and her prior drug arrests, when viewed in the light most favorable to the district court's decision, did not unreasonably extend the traffic stop for at least three reasons. First, Hill testified that Collazo had granted him permission to speak to her. The record also shows that Hill was waiting on the completion of the license check while he spoke to Cinthia because, when Hill returned to his patrol car, he informed Collazo that dispatch had not yet called back. Finally, Hill possessed a reasonable suspicion sufficient to ask the questions about drug activity based on the combination of (1) the Collazos' conflicting answers concerning their travel destination, (2) the jar of what appeared to be urine that he observed in the passenger compartment, and (3) Cinthia's erratic behavior. *See Rodriguez*, 135 S. Ct. at 1616–17 (noting that a traffic stop can be extended on the

basis of "reasonable suspicion of criminal activity"); *see also United States v. Winters*, 782 F.3d 289, 299–300 (6th Cir. 2015) (noting that "conflicting or implausible explanations of travel plans have been accorded some weight" when evaluating the existence of reasonable suspicion, and collecting cases). Hill testified that the inconsistent stories along with the bottle of what appeared to be urine were "consistent with criminal activity."

Nor did the interactions between Hill and Collazo after Hill returned from speaking with Cinthia unreasonably extend the traffic stop. During that time, Hill was waiting for the license check to come back, explaining the warning citation to Collazo, and obtaining his signature. These activities were all "incident to the traffic stop." *See Rodriguez*, 135 S. Ct. at 1615 (brackets and citation omitted). Accordingly, under the circumstances, the 21 minutes that Hill took to complete the traffic stop was not an unreasonable amount of time.

### b. Hill and Montgomery were justified in continuing their investigation beyond the 21 minutes needed to complete the traffic stop

Collazo was nevertheless detained beyond the 21 minutes needed for Hill to conclude the traffic stop. This continued seizure did not violate Collazo's Fourth Amendment rights because, before 21 minutes had passed, Montgomery had developed a reasonable suspicion of criminal activity based on his interactions with Cinthia. *See id.* at 1616–17. Montgomery walked to the passenger side of the van to talk to Cinthia approximately 16 minutes into the traffic stop. He testified that Cinthia acted "defeated" when he asked her whether there was something illegal in the van. Cinthia subsequently admitted that there was something illegal in her purse. After obtaining consent to search the purse, Montgomery found a prescription bottle for Suboxone and several loose Suboxone strips. When asked about the strips, Cinthia said that she had bought them from a relative for $10 each.

Cinthia's admission that she had paid a relative to obtain prescription drugs is more than sufficient to establish a reasonable suspicion of criminal activity. *See* 21 U.S.C. § 844(a) ("It shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice . . . ."); Tenn. Code Ann. § 39-17-418(a) ("It is an offense for a person to knowingly possess or casually exchange a

controlled substance, unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice."); *United States v. Carter*, 779 F.3d 623, 624 (6th Cir. 2015) (treating Suboxone as a controlled substance under federal law); *State v. Davis*, No. E2012-00495-CCA-R3-CD, 2013 WL 2253963, at *1 (Tenn. Crim. App. May 22, 2013) (recognizing Suboxone as a Schedule III controlled substance under Tennessee law).

Montgomery testified that Cinthia made this admission within three to five minutes of the beginning of their conversation. Accordingly, viewing the facts in the light most favorable to the district court's decision, Montgomery possessed a reasonable suspicion of criminal activity before Hill concluded the traffic stop. The officers were therefore justified in continuing their investigation beyond 21 minutes.

### 3.    *Hill and Montgomery had probable cause to search Collazo's van*

Collazo next challenges the district court's conclusion that Hill and Montgomery possessed probable cause to search his van. "[A]n officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Haynes*, 301 F.3d 669, 678 (6th Cir. 2002) (citation and internal quotation marks omitted).

Among the circumstances establishing probable cause to search the van are the facts that (1) Cinthia acted "defeated" and admitted that her purse contained something illegal, (2) Montgomery found the Suboxone strips in her purse, and (3) Cinthia told him that she had paid a relative $10 for each strip. *See United States v. Ross*, 300 F. App'x 386, 388–90 (6th Cir. 2008) (holding that an officer possessed probable cause to search a car where the car's passenger handed the officer a small plastic bag from the driver's compartment and a paper bag from the back seat, both of which contained marijuana); *see also* 21 U.S.C. § 844(a); Tenn. Code Ann. § 39-17-418(a); *Carter*, 779 F.3d at 624; *Davis*, 2013 WL 2253963, at *1.

Our conclusion is not undermined by the fact that Cinthia had a prescription bottle for Suboxone. First, viewing the facts in the light most favorable to the district court's decision, Cinthia told Montgomery that she had paid a relative $10 for each strip, and he could not remember Cinthia telling him that she had a prescription for Suboxone. Second, the pill bottle found in Cinthia's purse indicated that her prescription for 15 strips of Suboxone was filled on August 30, 2013. The pill bottle instructed her to "[d]issolve 1/2 film under the tongue every day." Given these instructions, an officer could reasonably conclude that the 14 strips in Cinthia's purse were not from the prescription that was over a month old.

Even if the Suboxone strips alone were not sufficient, other circumstances bolster the conclusion that the officers possessed probable cause to search the van. The Collazos' conflicting stories regarding whether they were on their way to visit Cinthia's sick father at an (unknown) hospital or at an (unknown) residence also support a probable-cause finding. *See United v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991) (concluding that "conflicting, and somewhat suspicious, stories told to [an] officer by the occupants of [a] car regarding . . . the purpose of their trip" contributed to the determination that there was probable cause to search the car); *United States v. Champion*, 609 F. App'x 122, 126 (4th Cir. 2015) (concluding that the "occupants' inconsistent answers as to their travel plans also contribute to a finding of probable cause to search the trunk" of a car).

Moreover, although nervousness alone is insufficient for probable cause, *see Lyons*, 687 F.3d at 770, Cinthia's nervousness along with her erratic movements and deceptive behavior could reasonably lead an officer to conclude that she was under the influence of a stimulant, *see United States v. Ewing*, 638 F.3d 1226, 1232 (9th Cir. 2011) (concluding that suspicion that a passenger was under the influence of a stimulant, as evidenced by nervousness "alongside compulsive movement and loud and rapid speech," is a contributing factor in "justifying the inference that the car was part of a drug-trafficking operation"). This, in turn, contributes to a determination of probable cause. *See id.*; *Lyons*, 687 F.3d at 770 (noting that "evasive behavior and nervousness may be considered as part of the probable cause analysis"). Taken together, these circumstances provide ample evidence to conclude that the officers possessed probable cause to search Collazo's van.

**4.** ***The district court did not err in declining to address whether the Collazos consented to the search of the van***

Finally, Collazo challenges the district court's failure to address the question of whether the Collazos consented to the search of the van. The district court declined to reach this issue because it determined that the search of the van was justified by probable cause. *See Lyons*, 687 F.3d at 770 (noting that "probable cause to believe the vehicle contains contraband" provides a sufficient basis for a warrantless search of the vehicle). Collazo cites no cases supporting the proposition that a court must address nondispositive issues when ruling on a motion to suppress. Indeed, he cites no cases at all to support his argument that the court erred in declining to address the consent issue. Because the issue of consent is not dispositive in this case, the court did not err by declining to address it. *See United States v. Ryals*, Nos. 95-6202, 95-6203, 1997 WL 295340, at *3 n.2 (6th Cir. June 2, 1997) ("Because we conclude that the officers had probable cause to search the vehicle, we decline to address the validity of [the defendant's] consent."); *see also United States v. Certain Real Prop. Located at 16510 Ashton, Detroit, Wayne Cty., Mich.*, 47 F.3d 1465, 1469 (6th Cir. 1995) ("Because we find this issue to be dispositive, we need not address [the appellant's] other arguments.").

Collazo, without citing any legal authority, nevertheless asserts that "[t]he district court erred by not considering credibility [sic] of these Officers on this issue and its weight on their credibility on all other issues." His argument is not only without merit, but raises the broader point that much of Collazo's arguments seek to relitigate the credibility of the witnesses and their stories. As an appellate court, however, we are constrained to view the facts in the light most favorable to the district court's decision, *see United States v. Pritchett*, 749 F.3d 417, 435 (6th Cir. 2014), with deference to be given to the district court's credibility findings, *see United States v. Ross*, 300 F. App'x 386, 390 (6th Cir. 2008) ("Matters of credibility are largely within the purview of the fact-finder . . . and findings of credibility are entitled to deference on appeal."). We therefore reject all of Collazo's claims.

### III.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.