**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0673n.06

No. 16-2329

| | | |
|---|---|---|
| **UNITED STATES COURT OF APPEALS** **FOR THE SIXTH CIRCUIT** | | **FILED** Dec 05, 2017 DEBORAH S. HUNT, Clerk |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | **ON APPEAL** FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| DARRELL CHRISTOPHER HUNT, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **Defendant-Appellant.** | ) | **OPINION** |
| | ) | |

**BEFORE: NORRIS, MOORE, and STRANCH, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.** Defendant Darrell Hunt entered into a conditional guilty plea to one count of drug trafficking, 21 U.S.C. § 841(a)(1), for which he received a sentence of 180 months of imprisonment. On appeal, he challenges the denial of his motion to suppress evidence stemming from a traffic stop.

**I.**

This prosecution arose from an investigation into heroin trafficking conducted by the West Michigan Enforcement Team ("the Team"). On September 2, 2015, the Team applied for, and received, a search warrant for "GPS/precision locator information for the cellular phone number 231-220-7228, for 9/1/2015 through 10/01/2015 and subscriber information including but not limited to MSID, ESN call detail records, incoming and outgoing call records with tower information, text message setup information for the time period September 1, 2015 through October 1, 2015."

Detective Kyle Hall submitted an affidavit in support of the application. According to the affidavit, Hall supervised two controlled drug purchases made by a confidential informant two weeks before the search at issue. The informant told Hall that he had "contact on multiple occasions with an individual known . . . as 'Brick.'" He went on to identify Brick as defendant, and indicated that defendant would travel fortnightly to Chicago in order "to pick up large quantities of heroin and cocaine." The same informant provided the cell phone number listed in the search warrant, which he said belonged to defendant.

The affidavit went on to state that defendant was currently on parole for a prior drug trafficking offense. At the subsequent suppression hearing, defendant's parole officer testified that a condition of parole was that defendant would not leave Michigan without permission. A second condition of parole obliged defendant to give law enforcement officers consent to search when requested.

The search and seizure at issue occurred in the early hours of September 13, 2015. Michigan State Trooper Christopher Boven received word from the Team that defendant's cell phone was in the Chicago area. Using tracking data authorized by the search warrant, a Kia Sportage was followed into Michigan. It contained defendant and his wife, An Nett, his adult daughter, Mercedes, and her minor children. According to Detective Hall's suppression hearing testimony, defendant stopped at a gas station in Grand Haven, Michigan where his daughter took the wheel. Trooper Boven trailed the vehicle at the request of the Team and eventually pulled it over at 12:34 a.m. for a lane violation. A dashboard camera recorded the stop and some, but not all, of the subsequent events.

Before pulling defendant's car over, Trooper Boven learned from the Team that a K-9 unit was on the way. Ottawa County Sheriff's Deputy Jeremy Osbun and his police dog, Zino,

arrived at the site of the stop within ten minutes. Before Deputy Osbun arrived, Trooper Boven and his partner, Andrew Rothermal, approached defendant's car. Trooper Boven explained to the driver, Mercedes Hunt, that she had been pulled over for a lane violation and asked whether she had had anything to drink. According to his suppression hearing testimony, Ms. Hunt told him that they were coming from Chicago where they had attended a baby shower. Trooper Boven returned to his cruiser after collecting everyone's identification and ran the information through two law enforcement databases to check for outstanding warrants and to confirm that Mercedes Hunt was a valid driver. Defendant contends that Trooper Boven entered the information slowly in order to prolong the traffic stop until the canine unit arrived, which it did shortly after he finished processing the licenses.

Once Deputy Osbun arrived, Trooper Boven explained the situation to him to "keep him in the loop" and for officer safety. He also turned off the dashboard camera. According to his testimony, he did so to prevent information about the confidential informant from coming to light in case the stop revealed no drugs. After speaking with Deputy Osbun, however, Trooper Boven apparently forgot to restart the dashboard camera and, as a result, there is no footage of the search of the car. In total, twenty minutes elapsed before the camera was restarted.

Trooper Boven asked Mercedes Hunt for permission to search the car. She declined. The officer then explained that they would perform a canine search and "depending on what the dog indicated or didn't indicate, we'd get them on their way momentarily." The dog alerted for the presence of drugs on the rear passenger-side compartment door area.

After the alert, Trooper Boven told defendant that the dog had detected narcotics and requested that he step out of the car. Defendant asked if he could speak to Boven behind the patrol car. Once there, he told the officer that the car contained both heroin and cocaine. At that

point, defendant was handcuffed. At approximately the time that the search of the car was beginning, Trooper Boven noticed that the dashboard camera had not been restarted and turned it back on.

Other officers from the Team had arrived while the dashboard camera was turned off. They later helped to transport the car's occupants to the Muskegon Police Department for questioning. Eventually, Mercedes Hunt, her two minor children, and defendant's wife were released. Defendant was arrested and detained. In the course of questioning, defendant admitted that the drugs found in the car were his and that no one else knew of them.

Defendant filed a motion to suppress evidence. It raised the following arguments: 1) that there was insufficient reasonable suspicion to conduct the canine sniff; 2) there was insufficient evidence of the the reliability of the dog sniff, in part because of the missing dashboard camera footage; 3) the search warrant used to obtain defendant's cell phone information was invalid because lacked information concerning the reliability of the confidential informant; and 4) defendant's statements implicating himself were coerced and therefore should be excluded.

**II.**

On appeal from the denial of a motion to suppress, "we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). In doing so, the evidence must be considered "'in the light most likely to support the district court's decision.'" *Id.* (quoting *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)).

*1. Validity of the Search Warrant*

In his affidavit supporting the search warrant, Detective Hall made the following statements: a confidential informant had recently made two controlled purchases for the Team

and was supervised by Hall; the informant told Hall that he knew defendant "travels to Chicago at least once every other week to pick up large quantities of heroin and cocaine" and is known by the nickname Brick; the informant provided Hall with a cell phone number he said was used by defendant; Hall verified that defendant was currently on parole for a 2013 drug trafficking offense. Defendant contends that the affidavit was insufficient on its face because it failed to tie the confidential informant to defendant. There is no allegation that the informant bought drugs from defendant, nor is there any information about how he knew that defendant was making trips to Chicago.

The district court reasoned that the relatively recent interaction between Hall and the confidential informant was enough to demonstrate the informant's reliability. Moreover, the court found the requested warrant to be a "comparatively noninvasive way to find out if there was truth and validity to what the confidential informant was saying about Mr. Hunt traveling between Chicago and West Michigan." In short, the affidavit established probable cause.

Probable cause exists when an issuing magistrate finds a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place. *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In our view, Detective Hall's affidavit satisfies this deferential standard. First, the reliability of the confidential informant was based upon two recent interactions with Hall in which Hall entrusted the informant with "buy" money, and the informant returned with the narcotics as instructed. Second, Hall determined that defendant was on parole for a drug trafficking crime, which is precisely the activity that the informant accused defendant of engaging in. And, third, there is a "nexus" between the trips to Chicago to purchase drugs and the location of defendant's cell phone, the number of which the informant provided.

## 2. The Length of the Stop

Defendant next argues that the search violated the Fourth Amendment because the officers extended the stop beyond the time required to investigate the traffic violation in order to conduct a canine sniff. The district court determined that the delay was not excessive, relying upon *United States v. Collazo*, 818 F.3d 247, 257-58 (6th Cir. 2016), in which we countenanced a traffic stop that exceeded twenty-one minutes based on the totality of the circumstances. Here, the district court observed that the canine unit appeared within ten minutes of the stop, the car's paperwork, which was a rental, did not include any of the passengers as authorized drivers, and the GPS information indicated that defendant had been out-of-state, which was prohibited by the terms of his parole. While these factors might individually have an innocent explanation, the court found that "from a law enforcement perspective all that adds up . . . to a reasonable suspicion for an extension, which . . . wasn't very long anyway."

We affirm based upon the reasoning of the district court.

## 3. Does the Lack of Dashboard Camera Footage Taint the Canine Search?

As mentioned earlier, Trooper Boven turned off the dashboard camera when Deputy Osbun arrived. The United States Supreme Court has explained that, when assessing probable cause to conduct a search subsequent to a positive canine alert for narcotics, a flexible "totality of the circumstances" test applies. *Florida v. Harris*, 568 U.S. 237, 244 (2013). A defendant must have the opportunity to challenge evidence of the dog's reliability, however, whether by cross-examination of its handler or by introducing his own fact or expert witnesses. *Id.* at 247.

Defendant contends that the lack of a visual record of the search undermines his ability to challenge the legitimacy of the canine alert to narcotics. First, there are no records maintained of the dog's prior performance in the field. Second, Deputy Osbun recalled up to six false alerts at

the suppression hearing, which defendant contends is a significant number given that dogs are deployed only when the presence of drugs is suspected. Third, the lack of dashboard camera footage makes it nearly impossible for defendant to challenge whether Deputy Osbun's interaction with the dog may have influenced its subsequent alert. Finally, defendant characterizes the missing video footage as "spoliation" for which the government must be held responsible.

The district court thought otherwise with respect to spoliation, which "requires something more than failing to capture all the information you would have the ability to capture." Rather, spoliation contemplates destruction or loss of evidence that has already been created. With respect to Deputy Osbun's testimony, the district court noted that the deputy testified about how he conducted searches in general and in this case specifically. Defendant had the opportunity to cross-examine Deputy Osbun about his method and thereby challenge the legitimacy of the search.

The missing footage is concerning but not fatal to the search. *Harris* relies on a commonsense, totality of the circumstances test. As the district court observed, defendant had the opportunity to question Deputy Osbun about his method of conducting canine searches, thereby satisfying *Harris*, 568 U.S. at 247. In our view, defendant had sufficient opportunity to contest the canine search and it was therefore properly considered in the probable cause determination.

### 4. Were Defendant's Statements Involuntary?

The final issue raised by defendant concerns the statements that he made concerning his ownership of the drugs in question. He argues that those statements were involuntary because they were made to exculpate his family members, motivated in part by officers' threats to call child protective services on his daughter.

The district court found that "the record . . . suggests that Mr. Hunt was comfortable enough with his situation, nervous though he may have been, to ask the officer 'Can we move to the back of the car? I want to talk to you privately.'" The court reasoned that such behavior was that of a person who is trying "to cut the best deal and position himself in the best way he can, protecting his family at the same time." In short, the court found "no testimony to . . . indicat[e] that any of that happened in a coercive way." Our independent review of the record supports this conclusion. At the time that defendant offered his initial inculpatory statements, he knew that the drugs, which he had placed in his car without the knowledge of his family members, had been detected. While he may have offered his statements in part to ensure that his family members were not implicated in drug trafficking, the record does not indicate that defendant's statements were coerced.

## III.

The judgment is **affirmed**.